Filed 5/7/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S082776 |
| v. | ) | |
| | ) | |
| ENNIS REED, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. TA037369-01 |
| _____ | ) | |

This automatic appeal follows from defendant Ennis Reed's 1999 conviction and death sentence for the murders of Amarilis Vasquez and Paul Moreland. Reed contends that several errors occurred during the guilt and penalty phases of his trial. After carefully considering defendant's claims, we find that they do not merit reversal of the guilt or penalty verdicts. So we affirm the judgment in its entirety.

## I. FACTS

Defendant Ennis Reed was charged in an amended information with two counts of murder (Penal Code § 187, subd. (a)),[1] two counts of attempted murder (§§ 667/187(a)), the special circumstance of multiple murder (§ 190.2, subd. (a)(3)), and various enhancements. The charges arose out of two separate incidents, but were consolidated in a single trial.

---

[1] All subsequent statutory citations are to the Penal Code unless otherwise noted.

SEE DISSENTING OPINIONS

A.  Guilt Phase

1. *The Vasquez Murder*

At around 8:00 p.m. on September 24, 1996, Carlos Mendez and his wife Amarilis Vasquez took a meal break from their jobs at a plastics factory.  The couple headed to Tacos El Unico, a Mexican fast food restaurant on Long Beach Boulevard in the City of Compton.  Mendez and Vasquez parked in the restaurant's lot and ordered food to go.  After they got back into their pickup truck, the couple noticed a man walking toward the truck with a large pistol.  Mendez had never seen the man before.  As Mendez started the truck, the man started shooting at them from a distance of roughly 20 feet.  Vasquez — sitting in the passenger seat — was hit first, in the head.  Mendez was then shot in the right cheek.  He got out of the truck and started running, but was hit again, this time in the left thigh.  Mendez fled about 15 feet from the truck before realizing that his wife was still inside.  By the time Mendez ran back to the passenger side of the truck, the man had disappeared.  Vasquez died from the gunshot wound to her head, while Mendez survived.

Officer James Lewis of the Compton Police Department was one of the first law enforcement officers to arrive on the scene.  Officer Lewis interviewed Mendez, who was clearly "very, very upset."  Mendez described the shooter as a black male with a black jacket.  Later that evening, Detective Michael Paiz of the Compton Police Department interviewed Mendez at the hospital.  Mendez described the shooter as a black male "about 5'8" to 5'11" in height, 20 to 25 years in age, clean shaven, short black hair, wearing a black jacket and black pants."  At trial, the parties stipulated that Officer Peters of the Compton Police Department would have testified that, on the day of the incident, Mendez described the shooter as "a male black adult, 25 years old, wearing black pants and

a black jacket, clean shaven, with short hair, 5'11", 150 to 180 pounds, medium complexion."

In January of 1997, Detective Paiz showed Mendez a six-photo array that included a photograph of defendant Reed. "[R]ight away," Mendez picked the photo of Reed. In May of 1998, Mendez identified Reed as the shooter at a preliminary hearing that Reed attended. About two months later — on July 14, 1998 — Mendez attended a live lineup at the county jail.[2] Mendez quickly selected Reed because his face "look[ed] like the same as in the photo." Mendez also identified Reed in court during the trial.

2. *The Moreland Murder*

On November 22, 1996, Roy Fradiue was hanging out with his friend Paul Moreland at Fradiue's uncle's house. The two started drinking sometime that evening — or possibly earlier — and smoked marijuana as well. Moreland died with phencyclidine (PCP) and cocaine in his system; a deputy medical examiner opined he must have ingested the cocaine within hours of his death.

At around 11:00 p.m., Fradiue and Moreland left the house to walk to a store on Long Beach Boulevard in the City of Compton. As the two were walking, Fradiue noticed a man standing with several "dudes" in the yard outside of a duplex on Glencoe Avenue. Fradiue had never seen the man before. He noticed that the man was holding "some type of rifle" with the barrel resting on his shoulder, pointing backward. The man said something to Moreland, but Fradiue could not understand what. Once Fradiue and Moreland passed the duplex, Fradiue heard a shot. He did not see the man fire the rifle but assumed that the man fired into the air because "it didn't hit nothing." Then, the man started firing

---

[2]     It was Reed who requested the live lineup after the preliminary hearing.

at Fradiue and Moreland. Fradiue headed south on Temple Avenue, while Moreland headed north. The man fired once at Fradiue, but the shot hit a pole instead.[3] Fradiue kept running and, a few minutes later, he heard "three or four more shots." Roland Darby was at his house near the intersection of Glencoe and Temple at the time of the shooting and recalled hearing a series of shots, a pause,[4] and then another series of shots. A few blocks away, Fradiue ran into another friend, who drove him back to his uncle's house.

Officer George Betor of the Compton Police Department was the first officer to arrive on the scene. He found Moreland's body at the corner of Glencoe and Temple avenues. Moreland had been shot nine times. Officer Betor collected three shell casings and bullet fragments from the area surrounding Moreland's body.

The next night, Officer Betor and two colleagues chased a man named Chico McLaine — a suspect in an unrelated matter — into a house near the scene of Moreland's murder. The officers encountered an unidentified man in the house but did not arrest him. The officers also found an SKS rifle and magazine, both of which Officer Betor seized because they fired the same caliber of bullet as the shell casings that the officer had found the night before. A forensic expert identified two of the three casings found near Moreland's body as having been fired by the SKS rifle. The third shell casing had been "worked through" the weapon but not fired. Tests were inconclusive, however, as to whether the bullet fragments came from the SKS rifle. Law enforcement also could not obtain any

---

[3]     Detective Paiz visited the scene during trial and found a rusty bullet hole in a "No Parking" sign on Temple Street. He testified that the bullet that created the hole was traveling in a "southwesterly direction."

[4]     At trial, Darby estimated the length of the pause as "about five to ten seconds" but was confronted with an interview report that indicated that he told an officer on the night of the incident that the pause was "two to three minutes."

4

fingerprints from the weapon or magazine. When shown the gun during his trial testimony, Fradiue stated that it "look[ed] like" the weapon he saw on November 22.

Officer Marvin Pollard of the Compton Police Department testified that — earlier in the same night as officers pursued McLaine — he had encountered Reed and filled out a field interview card describing their interaction. The card indicated that Officer Pollard encountered Reed near the intersection of Glencoe and Temple avenues. Officer Pollard stated that other officers were present, but that they did not enter any building during the encounter. The interview card included a description of Reed's tattoo, which Officer Pollard relied on to identify the defendant in court. The card also described Reed as weighing 122 pounds, although Officer Pollard could not recall if the information came from Reed himself or his state ID card. In the "Persons with Subject" area of the interview card, Officer Pollard wrote "I. McLaine."

Fradiue never contacted the police after escaping from the shooting that killed Moreland. In April 1997 — roughly six months after Moreland's death — Officer Paiz contacted Fradiue and showed him a six-photo array that included a photo of Reed. Fradiue testified that he selected Reed's photo after studying the array for "10 minutes," although Officer Paiz recalled that the identification took roughly "10 seconds." Fradiue thought that the shooter had "real short" hair, and admitted that Reed was the only subject in the lineup with "real short hair." Fradiue also identified Reed at the same post-preliminary hearing lineup that Mendez attended, as well as at trial.

3. *Defense Evidence*

Reed called a single witness, Foster Slaughter. Slaughter was sitting outside the Zodiac motorcycle club at the time of the Vasquez murder. Slaughter was about 50 feet from Tacos El Unico when someone started shooting at Mendez

5

and Vasquez. Slaughter saw the assailant only from the side but described him as a black male with long hair and a "big long coat." He estimated that the assailant weighed 190 to 200 pounds, although he admitted that the coat could have given him that impression. Slaughter testified that Reed did not "look like the one was there [*sic*]."

On rebuttal, the prosecution called Officer Kenneth Roller of the Compton Police Department. Officer Roller interviewed Slaughter immediately after the incident. Officer Roller's report indicated that Slaughter had described the assailant to him as a black male adult "wearing a three-quarter length black jacket and dark jean pants." The officer testified that he would have included additional information in the description had Slaughter provided any.

The jury convicted Reed of both counts of murder (in the first degree) and both counts of attempted murder. The jury also found true the special circumstance of multiple murder.

B. Penalty Phase

The first penalty phase trial ended in a hung jury, with the jury voting seven to five in favor of life without parole. The penalty phase retrial commenced on July 30, 1999. The parties stipulated that Reed had been convicted of attempted murder on September 12, 1992, "on an aiding and abetting theory . . . wherein he was charged as being the driver in a drive-by shooting, not the shooter." A parole officer testified that Reed was released from prison on August 3, 1996, and reported to the parole office two days later. The prosecution also introduced the following evidence specific to the two murders.

1. *The Vasquez Murder*

Carlos Mendez recounted what happened on the day of his wife's murder. He also testified about the effect of her death on him. Defense counsel cross-

6

examined Mendez about the circumstances of his identification of Reed as the shooter. Officer Robert Childs of the Compton Police Department arrived on the scene and collected nine shell casings and two expended bullets from the area surrounding Mendez's truck. A forensic pathologist testified about the cause of Vasquez's death.

2. *The Moreland Murder*

Roland Darby heard gunshots on the night of Moreland's murder. He also looked out the window and saw Moreland's dead body. Roy Fradiue recounted the circumstances of Moreland's murder. Defense counsel cross-examined Fradiue on various factors relating to the strength of his identification of Reed as the shooter: Fradiue had consumed alcohol and marijuana, it was dark out, and he had never seen the shooter before. Detective Paiz described the rusty bullet hole in the sign on Temple Street. Floyd Moreland — Paul's father — testified about his son's life and that he missed Paul "terribly." Officer Betor described the scene of Moreland's murder and recounted finding the SKS rifle in the nearby house. A forensic pathologist testified about the cause of Moreland's death.

3. *Defense Case*

Joe Galindo was at his girlfriend's house near Tacos El Unico on the evening of Vasquez's murder.[5] He was on her porch when he heard three gunshots. He then saw a black, "somewhat stocky" man run past his girlfriend's house at a distance of roughly 50 feet. Galindo did not see the man's face but did not believe that Reed was the man. Galindo — who was 6'1" and weighed about 200 pounds — testified that the man he saw "must have been at least my height or

---

[5] Galindo could not be located to testify during the guilt phase, and the trial court denied defense counsel's request for a continuance to allow the defense to find him. (See, *infra*, Part II.A.2.)

a little bit taller." Defense counsel then read Slaughter's testimony from the guilt phase to the jury.

Dolores Sheen was the executive director and principal of the middle school Reed attended for seventh grade. Reed displayed poor literacy and performed at a third or fourth grade level. Reed was initially interested in school, but his interest waned over time. Often tardy or absent, Reed began to exhibit behavioral disorders. Sheen attempted to involve Reed's mother in his education, but his mother did not provide any "visible support system." The school did not promote Reed to eighth grade.

Dolores Churchill was Reed's great-aunt. She testified that Reed's father and mother separated when Reed was in kindergarten. Reed had minimal contact with his father and his relationship with his mother was "strained." Reed always manifested learning disabilities and stopped going to school after seventh grade. Reed was always considerate, however, and tended toward "quietness" and "withdrawing, rather than an explosion of temper."

On rebuttal, Officer Lewis described his interview of Mendez immediately after the shooting. Mendez then recounted how he had selected Reed in both a photographic and live lineup. Officer Childs testified that, when he interviewed Galindo on the night of Vasquez's murder, Galindo told him only that the shooter was a "black male adult in a plaid shirt."

On August 4, 1999, the jury recommended imposition of the death penalty. On September 29, the trial court denied Reed's motion for a new trial and sentenced him to death.

## II. DISCUSSION

### A. Jury Selection and Pretrial Claims

#### 1. Batson/Wheeler *Motion*

Reed is African American. He contends the prosecutor violated his state and federal constitutional rights to equal protection and a jury drawn from a fair cross-section of the community by peremptorily excusing five black prospective jurors at the guilt phase. (See *Batson v. Kentucky* (1986) 476 U.S. 79, 89 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Wheeler*).) We find no error.

##### a. Factual Background

The trial court began voir dire on May 25, 1999. After exclusions for hardship, the jury venire consisted of 123 people, including 42 black jurors, 49 white jurors, 16 Hispanic jurors, 14 Asian jurors, one "Middle East[ern]" juror, and one juror whose race we are unable to determine. Once the parties excused certain jurors for cause or by stipulation, 82 prospective jurors remained. The first 18 jurors to enter the jury box included nine white jurors, six black jurors, two Hispanic jurors, and one Asian juror. Following a brief round of voir dire, the prosecution exercised peremptory strikes against Corrine T. (a white woman), Bert A. (a black man), Billie L. (a black woman), Betzaida C. (a Hispanic woman), and Janice C. (a black woman). During a second round of peremptory strikes, the prosecutor excused Bruno B. (a Hispanic man), Nickey W. (a black man), and Mary C. (a black woman).

After the prosecutor struck Mary C., defense counsel raised a *Batson*/*Wheeler* objection. Defense counsel noted that the prosecution had used five of his eight strikes up to that point on black prospective jurors. Without hearing from the prosecution, the trial court overruled the objection, stating "there

9

has not been a showing of a strong likelihood" that the prosecutor's challenges were racially motivated.

Before the jury was sworn, the prosecutor struck five additional jurors, one of whom was a black woman. The prosecutor also exercised three peremptory strikes during the selection of alternate jurors, one of which removed a black woman from the panel. The resulting guilt phase jury initially consisted of three black jurors, five white jurors, one Hispanic juror, two Asian jurors, and one "Middle East[ern]" juror. During the trial, one black juror was excused for hardship and replaced by a Hispanic alternate.

b. Analysis

Both the United States and California Constitutions prohibit discriminatory use of peremptory strikes. (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157-1159.) To assess whether such prohibited discrimination has occurred, our inquiry under *Batson*/*Wheeler* follows three distinct, familiar steps. First, the party objecting to the strike must establish a prima facie case by showing facts sufficient to support an inference of discriminatory purpose. (*Johnson v. California* (2005) 545 U.S. 162, 168 (*Johnson*).) Second, if the objector succeeds in establishing a prima facie case, the burden shifts to the proponent of the strike to offer a permissible, non-biased justification for the strike.[6] (*Ibid*.) Finally, if the proponent does offer a non-biased justification, the trial court must decide whether that justification is

---

[6] In cases where the trial court has concluded no prima facie case has been established, it is the better practice to "offer prosecutors the opportunity to state their reasons so as to enable creation of an adequate record for an appellate court, should it disagree with the first-stage ruling, to determine whether any constitutional violation has been established." (*People v. Scott* (2015) 61 Cal.4th 363, 388 (*Scott*).)

genuine or instead whether impermissible discrimination in fact motivated the strike.  (*Ibid*.)

The trial court denied Reed's *Batson*/*Wheeler* motion at the first step of the inquiry, finding Reed had not established a prima facie case.  But it did so at a time when California courts applied an unduly stringent standard for *Batson* claims at step one.  (See *People v. Carasi* (2008) 44 Cal.4th 1263, 1293.)  In *Johnson*, the United States Supreme Court rejected our previous standard — requiring that it be " 'more likely than not' " that purposeful discrimination occurred — as inconsistent with federal constitutional protections, and instead favored a standard turning on whether the opponent of the strike has " 'produc[ed] evidence sufficient to permit the trial judge to draw an inference' " of discrimination.  (*Carasi*, 44 Cal.4th at p. 1293, quoting *Johnson*, 545 U.S. at p. 170.)  As the People concede, the trial court here denied the motion using the "more likely than not" standard that *Johnson* disapproved.  In these circumstances, we conduct our own independent review of the record and apply the *Johnson* standard to determine whether the record supports an inference that the prosecutor excused a juror on a discriminatory basis.  (*People v. Bonilla* (2007) 41 Cal.4th 313, 342 (*Bonilla*).)

Although we examine the entire record when conducting our review, certain types of evidence are especially relevant.  These include whether a party has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged those prospective jurors in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group to which a majority of remaining jurors belong.  (*Scott*, *supra*, 61 Cal.4th at p. 384.)  We may also consider nondiscriminatory reasons for the peremptory strike that "necessarily dispel any

11

inference of bias," so long as those reasons are apparent from and clearly established in the record.  (*Ibid*.)

What Reed relies on primarily to advance his challenge is evidence of disproportionate strikes against black jurors.  The prosecutor used five of his first eight peremptory strikes (roughly 63 percent) on black jurors, even though such jurors constituted only 34 percent of the venire.  Considered in the context of the entire jury selection process, however, these initial strikes do not support an inference of discriminatory intent.  (See *People v. Garcia* (2011) 52 Cal.4th 706, 748 [considering ratio of stricken challenged jurors in context of overall strikes, including those made after *Batson/Wheeler* motion].)  The prosecutor's next four strikes all targeted non-black jurors, and taken together, his strikes did not target black jurors in a particularly disproportionate manner.  The prosecutor exercised 13 strikes during the selection of regular jurors, and three more while selecting alternates.  Six of the prosecutor's thirteen regular juror strikes (46 percent) — and seven of sixteen overall (44 percent) — targeted black jurors.  Although these figures exceed the 34 percent ratio of black jurors in the venire, they do so only barely.  Viewed in its overall context, the pattern of strikes by itself does not suggest the inference of discrimination that might otherwise be drawn from the prosecutor's initial strikes.

What is more, the prosecutor first signaled his acceptance of a jury at a time when it contained two black jurors, and three black jurors ultimately sat on the jury.  (See *People v. Clark* (2011) 52 Cal.4th 856, 906 [noting that prosecutor's repeated passing of "an African-American woman who ultimately served as a juror in the guilt phase" helped dispel any inference of discriminatory motive].)  It is true that the prosecutor used his last strike on a black woman before the trial court empaneled the jury.  But another black juror replaced her, and the prosecutor immediately accepted the panel.  While acceptance of one or more black jurors by

12

the prosecution does not necessarily settle all questions about how the prosecution used its peremptory challenges, these facts nonetheless help lessen the strength of any inference of discrimination that the pattern of the prosecutor's strikes might otherwise imply. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 487 ["The prosecutor's acceptance of a panel including these African-American prospective jurors, while not conclusive, was 'an indication of the prosecutor's good faith in exercising his peremptories . . . .' "].) Most notably, the prosecutor's decision to strike one black juror while accepting another who replaced her suggests that non-race related differences between the jurors, rather than race, explain the prosecutor's actions. (See *ibid.*)

Reed also argues that the prosecutor struck the challenged jurors without asking them voir dire questions. Yet the prosecutor did in fact engage Billie L. in a lengthy colloquy regarding her views on the death penalty. More important, the attorneys received the jurors' questionnaires prior to commencement of voir dire. What we have held is that under these circumstances, an attorney's failure to engage jurors in voir dire is less significant than when the attorneys know nothing about the jurors prior to striking them. (See *People v. Taylor* (2010) 48 Cal.4th 574, 615 (*Taylor*).) Accordingly, we accord no great weight to the prosecutor's limited voir dire.

We find further evidence dispelling any inference of bias in the struck jurors' questionnaires and answers during voir dire. (See *People v. Sanchez* (2016) 63 Cal.4th 411, 435-439 (*Sanchez*) [considering nondiscriminatory reasons for peremptory challenges that are apparent from and "clearly established" in the record].) While we are not relying here solely on hypothesized prosecutor reasons to strike a juror in assessing a *Batson/Wheeler* motion, a record devoid of any support for race-neutral reasons justifying prosecutor strikes would raise further concerns. In this case, however, the record is not devoid of support for race-

13

neutral reasons for excusing each of the jurors in question. Bert A. wrote that his brother had a negative experience with law enforcement when he was convicted of robbery in 1984. We have previously recognized a relative's negative experiences with law enforcement as a race-neutral hypothetical reason for a strike that dispels any inference of discriminatory intent. (See *People v. Harris* (2013) 57 Cal.4th 804, 836 (*Harris*).) Moreover, Bert A. reported that he had previously served on a criminal jury that hung. We have also recognized such a disclosure as the sort that sufficiently dispels any inference of discrimination. (See *People v. Farnam* (2002) 28 Cal.4th 107, 138 (*Farnam*).)

Similarly, both Janice C. and Mary C. reported that their spouses had prior contact with law enforcement. Janice C. wrote that her spouse had been convicted of a drug offense in 1977, while Mary C. stated that her husband had been arrested or charged with a crime 10 years prior to Reed's trial. (See *People v. Booker* (2011) 51 Cal.4th 141, 167 ["A negative experience with the criminal justice system is a valid neutral reason for a peremptory challenge"]; *Harris*, *supra*, 57 Cal.4th at p. 836.)

Billie L. stated in her questionnaire that she was "[s]trongly against" the death penalty and, during voir dire, she repeated this view, commenting that "I believe that maybe we should just not have a death penalty." These statements were later subject to a measure of equivocation, given her statement that "Each case is unique. The death penalty must be considered very carefully." Even so, the prosecutor could have had a reasonable preference to strike Billie L. because of the risk — in light of her earlier statements — that she would in fact refuse to impose the death penalty. We have previously held that the declaration of opposition to the death penalty, even when combined with some subsequent equivocation, reasonably dispels any inference of discrimination. (See *Scott*,

14

*supra*, 61 Cal.4th at pp. 384-385; *People v. Panah* (2005) 35 Cal.4th 395, 440-441.)

Finally, Nickey W. offered answers on his questionnaire that were sufficiently conflicting to raise the possibility for reasonable concern by the prosecutor. In response to a question about whether he understood and agreed that the fact defendant had been charged with certain crimes was not evidence of his guilt, Nickey W. wrote "no," but then added "you are innocent until proven [guilty]." Later, Nickey W. rejected the proposition that a defendant is not required to prove that he is innocent, and elaborated that "the defendant has to prove his [innocence]." The concerns raised by Nickey W.'s response to critical aspects of the questionnaire provide a strong reason for the prosecutor to excuse him. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 470.)

Reed also contends that a comparison between the jurors struck by the prosecution and the non-black jurors that ultimately served on the jury proves these rationales could not have motivated the prosecutor's strikes. In particular, Reed suggests that, if the rationale for the prosecutor's strikes against black jurors Bert A., Janice C., and Mary C. was grounded in their relatives' arrests or criminal convictions, the prosecutor should have also challenged non-black jurors with relatives who had comparable experience with the criminal justice system. We have often declined to undertake comparative juror analysis at step one of the *Batson*/*Wheeler* framework. (See, e.g., *Sanchez*, *supra*, 63 Cal.4th 411 at p. 439; *Taylor*, *supra*, 48 Cal.4th at pp. 616-617; *Bonilla*, *supra*, 41 Cal.4th 313 at p. 350.) Nonetheless, such analysis can be helpful in certain circumstances to assess whether a defendant established a prima facie case of bias. (See *Scott*, *supra*, 61 Cal.4th at p. 390; *Harris*, *supra*, 57 Cal.4th at 874-876 (conc. opn. of Liu, J.).) Reed's comparisons in this case, however, are unavailing.

15

It is true that Bert A., Janice C., and Mary C. have family members who were arrested or convicted of crimes. Nonetheless, the prosecution had additional, independent reasons for striking these potential jurors aside from the fact that their relatives had a criminal history. For one, Bert A. indicated that he previously served on a criminal jury involving a murder charge that resulted in a hung jury. (See *Farnam*, *supra*, 28 Cal.4th at p. 138 [concluding that sitting on a hung jury "constitutes a legitimate concern for the prosecution"].) Mary C.'s questionnaire answers, meanwhile, were frequently incomplete and, in particular, she failed to answer critical questions related to her husband's criminal history.

There is a further distinction in whether the relevant family members had been convicted of their respective crimes. The relatives of Bert A. and Janice C. had indeed been *convicted*. Bert A.'s brother was convicted and served time for burglary, and Janice C.'s husband was convicted on drug charges. Although Reed compares Bert A. and Janice C. with jurors whose family members had been arrested, no evidence suggests these family members were convicted or served time in prison. The prosecutor could have readily concluded that a criminal conviction, or time spent in prison, was more significant than simply having a family member arrested. (See *People v. Lancaster* (2007) 41 Cal.4th 50, 78 ["[N]o inference of group bias appears from the prosecutor's decision to challenge a prospective juror whose family members were serving or had served prison terms"].)

Accordingly, Reed fails to demonstrate that the totality of relevant facts give rise to an inference of discriminatory intent for the prosecutor's strikes. (See also *People v. Gray* (2005) 37 Cal.4th 168, 189 [a prosecutor may "excuse a prospective juror for a variety of reasons, finding no single characteristic dispositive"].)

16

## 2. *Motion for a Continuance*

On the first day of trial, Reed motioned to continue proceedings so he could secure the presence of Joe Galindo as a defense witness. The trial court denied the motion. Reed contends that the trial court's decision was an abuse of discretion, and that it violated his federal constitutional rights under the Sixth Amendment and his right to due process under the Fourteenth Amendment. We reject the claim.

During the first morning of trial, Reed's attorney made an oral motion for a continuance to secure the presence of Joe Galindo. Reed's attorney stated only that Galindo was a member of the National Guard who had been deployed, "perhaps to Yugoslavia." The prosecutor then objected to the continuance. He explained to the trial court that Galindo did not witness the shooting of Vasquez and Mendez but did see someone running away from the location of the shooting shortly after it occurred. He further explained that Galindo could not identify the fleeing individual but could offer a description of him that is "somewhat consistent, somewhat inconsistent with the way the defendant looks." Reed's attorney then stated that the prosecutor's description of Galindo's anticipated testimony was "fair and accurate." The trial court denied the motion without hearing further argument. After the penalty phase retrial — at which Galindo testified — Reed moved for a new trial based on the earlier denial of his motion for a continuance. The trial court denied the motion.

A criminal trial may be continued only upon a showing of good cause. Trial courts have wide discretion to determine whether such cause exists. (§ 1050, subd. (e); *People v. Doolin* (2009) 45 Cal.4th 390, 450.) In making that determination, courts consider whether the moving party has acted diligently, the anticipated benefits of the continuance, the burden that the continuance would impose on witnesses, jurors, and the court, and whether a continuance will

17

accomplish or hinder substantial justice. (*Doolin*, at p. 450.) On appeal, we review all circumstances relevant to the motion to determine whether the trial court's decision was so arbitrary as to deprive the movant of due process. (*Ibid*.)

We find no abuse of discretion here. Reed's attorney requested a continuance of unknown duration, and suggested to the trial court that Galindo might not be available to testify for quite some time.[7] Indeed the trial court was understandably concerned that granting a continuance would delay the trial indefinitely. Under these circumstances, the trial court did not act arbitrarily in believing that any continuance would impose a significant burden on everyone involved in the trial, not least the prospective jurors who had filled out lengthy juror questionnaires and arrived at court that day for the beginning of juror selection.

Nor did Reed's attorney suggest Galindo's testimony was particularly beneficial to the defense. In fact, defense counsel expressly agreed with the prosecutor's contention that the anticipated testimony would only be partially exculpatory, in that Galindo's description of the individual would be "somewhat consistent, somewhat inconsistent" with Reed. Reed argues that Galindo's testimony at the penalty phase retrial was more helpful to the defense than suggested during the request for a continuance. While we consider all circumstances relevant to a ruling on a motion for a continuance, we focus particular attention on the reasons actually given for the request. (See *People v. Mungia* (2008) 44 Cal.4th 1101, 1118 [" 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.

---

[7] We also note that defense counsel did not mention his efforts to secure witness Galindo's attendance until *after* the motion for a new trial. Although it appears that counsel did go to some lengths in attempting to serve the witness, he did not relay this information at the time the continuance was sought.

The answer must be found in the circumstances present in every case, *particularly in the reasons presented to the trial judge at the time the request is denied.*' "], quoting *Ungar v. Sarafite* (1964) 376 U.S. 575, 589, italics added.) And the reasons presented to the trial judge were not particularly compelling.

Reed also cites numerous cases where reviewing courts have found an abuse of discretion to have occurred after a trial court denied a continuance to secure a witness. Yet none of those cases present the circumstances here: a request for a continuance that would not only have been of indefinite duration but also of limited apparent utility. (See *Jennings v. Superior Court* (1967) 66 Cal.2d 867, 871 [request for four day continuance]; *People v. Buckey* (1972) 23 Cal.App.3d 740, 744 [request for continuance until "next court day" for "highly necessary" testimony]; *Bennett v. Scroggy* (1986) 793 F.2d 772, 775 [witness "probably could have been located overnight"]; *U.S. v. Flynt* (1984) 756 F.2d 1352, 1360 [continuance "would not have resulted in any cognizable inconvenience to the court or the government"]; *Hicks v. Wainwright* (1981) 633 F.2d 1146, 1149-1150 [witness available to give "critical" testimony "that evening or at any time thereafter"]; *U.S. v. Powell* (1978) 587 F.2d 443, 446 [request for four day continuance]; *Johnson v. Johnson* (1974) 375 F. Supp. 872, 876 [witnesses could have appeared "the next day"].)

So we find no abuse of discretion.[8]

---

[8]     Although Reed's briefing is unclear, he appears to challenge the trial court's denial of his motion for a new trial based on the denial of the motion for a continuance. Because we hold that the denial of Reed's motion for a continuance did not deny him a fair trial, we also reject any challenge to the trial court's ruling on the motion for a new trial. Our rejection of the merits of Reed's argument regarding the continuance also suffices to reject any constitutional " 'gloss' " on that claim. (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1050 fn. 4.)

B.  Guilt Phase Claims

1. *Sufficiency of the Evidence for the Murder of Amarilis Vasquez and Attempted Murder of Carlos Mendez*

Reed contends the prosecution introduced insufficient evidence to prove his identity as the assailant of Vasquez and Mendez.  He maintains that the prosecution's failure to carry its burden violated his right to due process under the Fourteenth Amendment of the United States Constitution.  (See *Jackson v. Virginia* (1979) 443 U.S. 307, 315-316.)  We find no error.

On appeal, the test for sufficiency of the evidence is whether evidence was presented from which a reasonable trier of fact could conclude, beyond a reasonable doubt, that the prosecution sustained its burden of proof.  (*People v. Boyer* (2006) 38 Cal.4th 412, 479 (*Boyer*).)  Although we assess whether the evidence is inherently credible and of solid value, we must also view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence.  (*Id*. at p. 480.)  Even identification of defendant by a single eyewitness may be sufficient to establish, beyond a reasonable doubt, defendant's identity as perpetrator of the crime charged.  (*Ibid*.)

Mendez's testimony and identification constitute the only evidence introduced to prove Reed's identity as the shooter in the Vasquez incident.  Nevertheless, when viewed in the light most favorable to the jury verdict, we find that Mendez's testimony provided sufficient evidence to sustain Reed's convictions.  Mendez identified Reed as the shooter in two separate lineups and at the preliminary hearing, and reiterated that identification at trial.  There was nothing "inherently improbable" about this testimony.  (See *Boyer*, *supra*, 38 Cal.4th at p. 480.)  Defense counsel also cross-examined Mendez about the factors that might undermine the reliability of his identification:  Mendez had never seen

20

the shooter before, and was understandably under substantial stress during the incident. Under these circumstances, the jury could reasonably have weighed the value of Mendez's identification and relied on it to find that Reed was the shooter.

Reed argues that the identification procedures were unduly suggestive because, Reed maintains, he was the only bald individual in the six-photo array and the only person to appear in both the photo array and in-person lineup. But defense counsel did not object to the identification procedures, and Reed does not now argue the trial court erred when it admitted evidence that Mendez identified Reed on those two occasions. Any other sufficiency argument based on the identification procedures attacks the credibility of Mendez's testimony, which we do not question when considering sufficiency of the evidence so long as the witness's testimony is not inherently improbable. (See *People v. Jennings* (2010) 50 Cal.4th 616, 638 (*Jennings*) [In considering the sufficiency of the evidence "[w]e neither reweigh the evidence nor reevaluate the credibility of witnesses."].) Reed also argues that several factors rendered Mendez's identification not credible, especially when compared to Slaughter's exculpatory testimony. Once again, however, these arguments go to the credibility of Mendez's testimony and its weight, which we cannot reconsider on appeal. [9] Accordingly, we find sufficient evidence of Reed's guilt for the murder of Amarilis Vasquez and attempted murder of Carlos Mendez.

---

[9] Reed also asks us to consider Galindo's exculpatory testimony as part of this claim. But when considering the sufficiency of the evidence, of course, we are limited to considering the evidence actually presented to the jury. (See *People v. Horton* (1961) 191 Cal.App.2d 592, 598 ["On a review of the sufficiency of the evidence to sustain the judgment of conviction, an appellate court is not permitted to go outside that record."].)

21

2. *Sufficiency of the Evidence for the Murder of Paul Moreland and Attempted Murder of Roy Fradiue*

Reed next challenges the sufficiency of the evidence identifying him as the shooter in the murder of Paul Moreland and attempted murder of Roy Fradiue. We apply the same standard as to Reed's challenge to his convictions for the Vasquez/Mendez incident, and we reject the claim as well.

Fradiue's testimony was the principal evidence of Reed's involvement in the Moreland/Fradiue shooting. Fradiue identified Reed as the shooter on three occasions: from the photo array, in the in-person lineup, and during trial. And as with Mendez's testimony, Reed's trial counsel cross-examined Fradiue on the circumstances that might lead the jury to doubt his identification: Fradiue was intoxicated, and he never reported the incident. Nothing rendered Fradiue's testimony inherently unreliable, so we hold that the jury could have reasonably relied on it to conclude that Reed was the shooter. (See *Boyer*, *supra,* 38 Cal.4th at p. 480.) What is more, the evidence put Reed very near the scene of the shooting the night after it occurred, and with an individual whose last name matched someone whom the police chased that same night into a home that contained the murder weapon. Considering all this evidence in the light most favorable to the guilty verdicts, the jury could reasonably have connected Reed to the murder weapon as the unidentified man that Officer Betor encountered in the house. (See *ibid.* [We "must presume every fact the jury could reasonably have deduced from the evidence."].)

Reiterating arguments advanced in his previous claims, Reed contends here that the identification procedures behind Fradiue's testimony were suggestive. He also offers several reasons why Fradiue's testimony could be unreliable. Such arguments fail to establish that Fradiue's testimony was inherently improbable, however, because they merely invite us to reweigh the evidence introduced at trial.

22

(See *Jennings*, *supra*, 50 Cal.4th 616 at p. 638.)  Reed also cites *People v. Trevino* (1985) 39 Cal.3d 667 and *People v. Blakeslee* (1969) 2 Cal.App.3d 83, but those cases are inapposite.  In *Trevino*, the eyewitness identification was highly equivocal, in contrast to Fradiue's consistent identification of Reed as the shooter.  (39 Cal.3d at p. 696 ["Mrs. Nyberg was never able to positively identify Rivas as the second man at the apartment."].)  And in *Blakeslee*, the prosecution offered no direct evidence of the defendant's guilt at all.  (2 Cal.App.3d at p. 838 ["No one witnessed the shooting, no one placed defendant in the apartment at the time of the shooting, no one saw defendant with a weapon, and no one identified defendant with any particular weapon."].)  Because the circumstances of this case are different, we reject Reed's claim.

### 3.  *Mendez's References to Reed as the "Devil"*

During his testimony at the guilt phase, Mendez referred to Reed as "this devil" or "that devil" on 13 occasions (for example when testifying "I saw this devil coming with pistol, you know, against us").  Defense counsel did not object at any point or move for a mistrial.  Mendez also referred to Reed as "that devil" or "this devil" three times during his testimony at the penalty phase retrial.  Defense counsel objected after the second of these outbursts and the trial court admonished Mendez to refer to Reed as "the defendant" or "Mr. Reed."  Mendez nevertheless referred to Reed as "this devil" once more, but defense counsel did not object or request a mistrial.  Reed argues that the trial court abrogated its duty to protect the jury from improper influence by failing to control Mendez and admonish the jury to disregard his outbursts.  (See *Sheppard v. Maxwell* (1966) 384 U.S. 333, 362 [due process requires an impartial jury free from improper influence].)

23

Courts indeed retain broad power to control their courtrooms and protect a defendant's right to a fair trial. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1237; see also *People v. Merkouris* (1956) 46 Cal.2d 450, 556 ["It is the duty of a judge in the administration of justice to preserve the order of the court and see to it that all persons whomsoever . . . indulge in no act or conduct calculated to obstruct the administration of justice."].) But we have never held that a trial court must sua sponte admonish the jury to ignore a witness's emotional outbursts. (See *People v. Medina* (1995) 11 Cal.4th 694, 727 [A trial court " 'has no sua sponte duty to exclude evidence or to remedy misconduct.' "], quoting *People v. Freeman* (1994) 8 Cal.4th 450, 490.) In *Medina*, we reiterated that due process did not compel a trial court to recognize and correct all instances of arguable prosecutorial misconduct. (*Ibid*.) So too with a witness's emotional outbursts. Reed was represented at trial, so the responsibility fell to defense counsel to protest any objectionable testimony. (See *People v. Hinton* (2006) 37 Cal.4th 839, 894 [A defendant must object to allegedly inadmissible evidence to preserve the claim.].) Indeed it is not inconceivable that, in certain circumstances, defense counsel would decide as a matter of strategy to allow a witness to engage in emotional outbursts, perhaps to undermine that witness's credibility. Imposing a duty on trial courts to intervene in these situations risks unnecessarily enmeshing trial courts in choices best left to defense counsel. (Cf. *People v. Seumanu* (2015) 61 Cal.4th 1293, 1312 ["[W]hether or not to object to evidence at trial is largely a tactical question for counsel."].)

Reed likens Mendez's conduct to the circumstances of *Rodriguez v. State* (Fla.Dist.Ct.App. 1983) 433 So.2d 1273. Leaving aside that the case merely constitutes potentially persuasive authority, it is easily distinguishable. In that case, defense counsel had moved for a mistrial after a witness's outbursts. (*Id*. at p. 1274.) The circumstances were similar in *Fuselier v. State* (Miss. 1985) 468

24

So.2d 45, another case Reed cites. (*Id*. at pp. 52-53 [noting that defense counsel repeatedly objected to the victim's daughter being allowed to sit with the prosecution during trial].) Accordingly, the cases do not support Reed's theory that the court had a duty to sua sponte intervene to control Mendez and admonish the jury. We find no error.

4. *Jury Instructions Related to Eyewitness Identification*

At the time of defendant's trial, CALJIC No. 2.92 was the model jury instruction that addressed eyewitness identification factors. The trial court proposed to give a version of the instruction that omitted two factors listed in the model: "Whether the witness had prior contacts with the alleged perpetrator" and "The witness'[s] capacity to make an identification." Reed argues the trial court erred reversibly in overruling defense counsel's objection to these omissions. Although we agree with Reed that the trial court erred in striking the omitted factors, we do not think it reasonably probable that the Reed would have received a more favorable result had the court given the complete instruction. (See *People v. Ward* (2005) 36 Cal.4th 186, 214 (*Ward*) [reviewing potential error in substance of CALJIC No. 2.92 under *People v. Watson* (1956) 46 Cal.2d 818 harmless error standard].)

a. Striking of CALJIC No. 2.92 Factors was Erroneous

A defendant is entitled to a specific "pinpoint" jury instruction if it relates to particular facts or a theory of the defense and is supported by substantial evidence. (*People v. Nelson* (2016) 1 Cal.5th 513, 542.) More specifically, "CALJIC No. 2.92 or a comparable instruction should be given when requested in a case in which identification is a crucial issue and there is no substantial corroborative evidence." (*People v. Wright* (1988) 45 Cal.3d 1126, 1144.) The trial court clearly believed that eyewitness identification was a major issue in the

case, as it included CALJIC No. 2.92 in the instructions. But it nonetheless overruled Reed's request that it give an unmodified version of the instruction.

The trial court chose to omit any reference in the instructions to "[w]hether the witness had prior contacts with the alleged perpetrator" because, it concluded, no evidence existed that any "witnesses have ever had any contact with Mr. Reed." The People attempt to defend this rationale on appeal, arguing that Reed had to supply substantial evidence of prior contacts between the defendant and witnesses for the instruction to be relevant. But this argument ignores that a *lack* of evidence of prior contacts with the eyewitness is also relevant to the strength of an identification. As defense counsel explained to the trial court, the portion of CALJIC No. 2.92 in dispute calls jurors' attention to the fact that eyewitness identifications are considered to be less reliable when the eyewitness has never seen the suspect before. Indeed it would make no sense to condition a defendant's right to this portion of the instruction on a showing of prior contacts between the witness and the defendant, because such evidence would tend to favor *the prosecution*. Accordingly, we hold that the trial court should have included this factor in the version of CALJIC No. 2.92 given to the jury.

For the factor concerning "[t]he witness'[s] capacity to make an identification," the trial court reasoned that its applicability is limited to "someone who is of minor age" or similar circumstances. We read this to indicate that the trial court believed the factor applicable only to capacity limitations that are innate (e.g., age or mental disability) as opposed to exogenous (e.g., intoxication). There is no apparent reason, however, to give the instruction this limited interpretation. Although some contemporaneous definitions of "capacity" might suggest such a limitation, others do not. (See Webster's 9th New Collegiate Dict. (1987) p. 203 [including both "mental or physical ability" and "potential for . . . experiencing" as definitions]; see also *People v. Sanders* (1995) 11 Cal.4th 475, 514 fn. 5 [noting

26

that CALJIC No. 2.92 was promulgated in 1984].)  Evidence that Fradiue was intoxicated when attacked — something that defense counsel brought to the court's attention when discussing jury instructions — justified leaving the "capacity" factor in the instructions.

Nevertheless, defense counsel conceded — perhaps unnecessarily — that an argument based on Fradiue's intoxication was not "really a capacity argument." Counsel appeared to agree that this factor could be omitted if the instruction given to the jury included the catchall "Any other evidence relating to the witness' ability to make an identification."  We therefore hold that Reed forfeited any challenge on appeal to the omission of this factor from the jury instructions.  (See *People v. Fuiava* (2012) 53 Cal.4th 622, 653 [objection to trial court's voir dire is forfeited where defense counsel submitted particular questions but then "assent[ed]" to trial court's alternate approach].)

b.  Any Error Related to the Modification of CALJIC No. 2.92 was Harmless

Although the trial court should have instructed the jury with a version of CALJIC No. 2.92 that included the requested factors, its failure to do so was harmless.  The instruction the trial court did use included the catchall "Any other evidence relating to the witness' ability to make an identification," which gave defense counsel the latitude to offer arguments based on the lack of prior contacts between Reed and the eyewitnesses and Fradiue's intoxication.  In fact, defense counsel argued during closing that Fradiue's identification was unreliable because he had "been drinking all day."  And while defense counsel did not offer any specific argument based on the lack of prior contacts, the trial court's decision to modify CALJIC No. 2.92 did not preclude defense counsel from doing so.  We are not persuaded, furthermore, that there is any reasonable probability that Reed would have obtained a more favorable result if defense counsel had offered such

27

an argument. The focus of Reed's attorney's closing argument was the asserted unreliability of Fradiue's and Mendez's identifications. Because "defendant strongly attacked the accuracy of the eyewitness identifications," there is no reasonable probability that the inclusion of the omitted CALJIC No. 2.92 factors — and any additional argument expressly connected thereto — would have led to a more favorable verdict for the defendant. (*Ward*, *supra*, 36 Cal.4th at p. 214.)

### C. Penalty Phase Claims

#### 1. *Issues Relating to Lingering Doubt*

Reed argues that the trial court erred in refusing to instruct the penalty phase retrial jury on lingering doubt. (See *People v. Gay* (2008) 42 Cal.4th 1195, 1218 (*Gay*) ["'The lingering doubts of jurors in the guilt phase may well cast their shadows into the penalty phase and in some measure affect the nature of the punishment.' "], quoting *People v. Terry* (1964) 61 Cal.2d 137, 146.) He also claims that other aspects of the trial court's communications with the jury intruded on defense counsel's ability to argue lingering doubt, and essentially directed a verdict of death. We find no error.

#### a. Factual Background

Before the penalty phase retrial, and again after the close of the evidence, the trial court informed jurors that Reed's guilt for Vasquez's and Moreland's murders was to be "conclusively presumed" and had been "conclusively proven." After the end of the retrial, defense counsel requested two jury instructions relating to lingering doubt. The prosecutor objected, and the trial court declined to give the instructions. The instructions given addressed the section 190.3 factors to determine a murder penalty, including factor (k), which directs the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." The jury instructions also stated that the

28

defendant had previously been convicted of first degree murder with a special circumstance found true.

During closing argument, defense counsel argued at length that problems with Mendez and Fradiue's identifications of Reed should lead the jury to reject the death penalty. After the jury deliberated for several hours, it asked the court the following question:

> If the jury agrees that one of the cases presented warrants the death penalty, however, one of the cases contains some doubt, according to the instructions, is it sufficient for awarding death?

Defense counsel argued that the trial court should respond "no" and inform the jury that it could consider lingering doubt as a circumstance in mitigation. The prosecutor argued that "legally the answer to the question is yes," but expressed concern that telling the jury "yes" would be "telling them how they should vote." The parties therefore settled on the following answer: "All things considered, including whatever doubt you may have on one of the murders, all things considered, you can chose one or the other." The trial court then instructed the jury as follows:

> That all things considered in this case, in the context of your question, the jury still may choose which of the two penalties is appropriate in this case. The answer is yes.

After further deliberation, the jury returned a verdict of death.

b. Analysis

We can readily address Reed's contention that the trial court erred in refusing to instruct the jury before it began deliberating on lingering guilt. We have "put to rest" the "*Cox* dictum that a lingering doubt instruction *may* be required as a matter of statutory law." (*Hartsch*, *supra*, 49 Cal.4th at pp. 512-513.) Rather, "the standard instructions on capital sentencing factors, together with counsel's closing argument, are sufficient to convey the lingering doubt

29

concept to the jury." (*Id*. at p. 513; see also *People v. Jackson* (2016) 1 Cal.5th 269, 369-370 ["Neither state nor federal law requires a trial court to instruct a penalty jury to consider lingering doubt as a factor in mitigation."].) Reed does not dispute that the trial court instructed using the standard sentencing factors and that his attorney argued lingering doubt extensively during closing. We therefore find no error.

Reed also challenges the trial court's response to the jury's query. As an initial matter, the Attorney General argues that Reed has waived this claim "because defense counsel both participated in the formulation of a response and affirmatively approved of the response ultimately given." But the response given to the jury differed in two material respects from that to which the parties agreed: The trial court omitted the proposed instruction's reference to lingering doubt and added "[t]he answer is yes" to the end of the response. Because the instruction given materially differs from that to which Reed's attorney acceded, Reed did not waive the issue.

On the merits, we find no error. We reject the argument that the question's reference to "doubt" entitled Reed to his proposed lingering doubt instruction. In *People v. Brooks*, the jury asked whether "one item in mitigation was enough for a sentence of life without the possibility of parole," a concept that we have repeatedly held that a trial court does not need to specifically explain to the jury. (*People v. Brooks* (2017) 2 Cal.5th 674, 768.) We did not embrace the defendant's contention that the jury's question required the trial court to give his proposed instruction on the issue. (*Id*. at pp. 768-769.) The circumstances here are similar. The sheer fact that the jury appeared to be confused about lingering doubt did not automatically entitle the defendant to his proposed instruction. Instead, we review the trial court's response for abuse of discretion to determine whether it adequately satisfied the jury's request for information. (*Id*. at p. 769.)

30

Here, there was no abuse of discretion.  The instruction was an accurate statement of relevant law.  Lingering doubt is but one factor a jury may consider when determining the appropriate penalty.  And no single section 190.3 factor "determines which penalty — death or life without the possibility of parole — is appropriate." (*Virgil*, *supra*, 51 Cal.4th at p. 1279, quoting *People v. Prieto* (2003) 30 Cal.4th 226, 263.)  Accordingly, a jury may impose a death sentence notwithstanding its belief that mitigating circumstances, including lingering doubt, exist.  (See CALJIC No. 8.88 ["To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."].)  The trial court's statement that, even if the jury has some doubt, it "still may choose which of the two penalties is appropriate" was therefore an accurate statement of the significance of the existence of lingering doubt in jury's penalty determination.  Reed seizes on the prosecutor's comment that "telling [the jury] yes they can" — something the trial court added to the end of the supplementary instruction — "will be telling them how they should vote."  He argues that even the prosecutor recognized that the court's statement essentially directed a death verdict.  Read as a whole, however, the supplemental instruction did not direct a verdict but instead advised the jury that it could impose a death sentence based on "all things considered in this case" even if it found lingering doubt.  We therefore find no error.

Reed also takes issue with the trial court's statements that his guilt was to be "conclusively presumed" and had been "conclusively proven."  But we have previously held that similar statements do not impede a defendant's ability to argue lingering doubt.  (See *People v. Streeter* (2012) 54 Cal.4th 205, 265 ["The trial court properly instructed the jury that the penalty phase jury must conclusively accept the previous guilt phase jury's findings on

31

defendant's guilt and on the truth of the special circumstance allegations."]; see also *People v. DeSantis* (1992) 2 Cal.4th 1198, 1236, 1238 [holding that trial court's statement that defendant's guilt "has already been decided" "did not remove the question of lingering doubt from the jury, but only told it the truth: that in the penalty phase defendant's guilt was to be conclusively presumed as a matter of law"].) Reed relies on *Gay*, *supra*, 42 Cal.4th 1195, but that case is distinguishable. In *Gay*, the error was evidentiary: the trial court erroneously precluded defense counsel from introducing evidence inconsistent with the prior jury's guilty verdict. (42 Cal.4th at p. 1218.) Here, by contrast, the defense introduced considerable testimony during the penalty phase retrial asserting that Reed was not the shooter. *Gay* did note that the trial court's instructions to the jury compounded its evidentiary error. (42 Cal.4th at p. 1224.) But those instructions told the jury to "disregard" any statements or evidence that contradicted the prior jury's verdict. (*Id*. at p. 1225.) In contrast, the instructions here did nothing of the sort. Because of this, the instructions were not erroneous.

Finally, Reed argues that the trial court erred by failing to inform the penalty phase retrial jury of the first jury's deadlock and that Galindo did not testify during the first trial. Defense counsel did not request either of these instructions. Any claim based on the trial court's failure to instruct on these points is therefore forfeited. (Cf. *Jennings*, *supra*, 50 Cal.4th at p. 675 [failure to request pinpoint instruction forfeits claim on appeal].) On the merits, we have made clear that "the fact of a first jury's deadlock, or its numerical vote, is irrelevant to the issues before the jury on a penalty retrial." (*People v. Hawkins* (1995) 10 Cal.4th 920, 968, abrogated on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 109-111.) As for information about Galindo's absence during the guilt and first penalty phases, it too bore no obvious relevance to the issue before the penalty retrial jury. Reed argues that the information highlighted the weakness of the

32

prosecution penalty phase case, as the first penalty phase jury deadlocked even without Galindo's testimony. But this argument depends on information about the first jury's deadlock being admissible — it is not. Any other argument based on Galindo's absence would serve only to attack the validity of the guilt phase verdict, something a defendant cannot do when offering lingering doubt evidence. (See *Gay*, *supra*, 42 Cal.4th at pp. 1223 [A "defendant may not 'relitigate' the guilt verdict."], quoting *State v. Teague* (Tenn. 1995) 897 S.W.2d 248, 252.) Accordingly, no error resulted from failing to inform the jury of that fact.

 2. *Alleged Coercion of Juror No. 1*

 At about 10:45 a.m. on the second day of deliberations, the penalty retrial jury informed the trial court that it had reached a verdict. The trial court read aloud a verdict of death signed by the jury foreman, and the jury collectively affirmed that this was indeed its verdict. The trial court then individually polled the jurors. When asked whether the verdict was in fact the juror's verdict, Juror No. 1 answered "No." Asked again, Juror No. 1 reiterated "No." The trial court then polled Jurors No. 2 through No. 6, all of whom responded "Yes." At this point, the trial court stopped and instructed the jury as follows:

> It appears that we do not have a unanimous verdict. I'm going to return the verdict form to you and ask the jurors to go back into deliberations, please. Thank you.

Just after 2:00 p.m. that afternoon, the jury returned a verdict of death. This time, all jurors collectively and individually affirmed that the death verdict was their true verdict. Reed argues that the trial court's actions coerced Juror No. 1 to acquiesce in a majority guilty verdict. Specifically, he argues that the court should have admonished the jurors that each should arrive at his or her own decision and that the jury was not required to reach any verdict. We are not persuaded.

33

The trial court's comments were quite benign.  They were not marred by the problems we have recognized in other instructions in potential holdout juror situations.  (See *People v. Valdez* (2012) 55 Cal.4th 82, 162 [It is error for instruction to deadlocked jury to "single out minority jurors or encourage those jurors . . . to consider, along with the arguments and the evidence, 'their own status as dissenters.' "], quoting *People v. Gainer* (1977) 19 Cal.3d 835, 848; *People v. Peoples* (2016) 62 Cal.4th 718, 783 (*Peoples*) ["Coercion occurs where 'the trial court, by insisting on further deliberations, expresse[s] an opinion that a verdict should be reached.' "], quoting *People v. Rodriguez* (1986) 42 Cal.3d 730, 775.)  Reed argues that the lack of "cautionary instructions" implied that the jury needed to reach a verdict.  But before deliberations began the court instructed the jury that "each of you must consider the evidence for the purpose of reaching a verdict *if you can do so*" and that "each of you must decide the case for yourself." The instructions also told jurors not to "decide any question in a particular way because a majority of the jurors, or any of them, favor that decision."  Under the circumstances, the initial jury instructions adequately conveyed that jurors did not need to reach a verdict, and that they should not acquiesce in a verdict with which they did not agree.  The trial court therefore did not err in not offering supplemental instructions when it emerged that the jury's verdict was not unanimous.

### 3. *Penalty Phase Retrial*

Reed contends that retrying the penalty phase after the initial jury deadlocked violated his rights under the United States and California Constitutions.  We have consistently rejected these claims, and see no reason to reconsider in this case.  (See, e.g., *Peoples*, *supra*, 62 Cal.4th at p. 751.)

34

4. *Assorted Instructional Errors*
a. No Preference for the Death Penalty

Reed argues that the trial court erred when it denied his request for an instruction that the law does not have a preference for death. We have repeatedly held that trial courts need not include such an instruction in light of the standard penalty phase jury instructions. (See, e.g., *People v. Watson* (2008) 43 Cal.4th 652, 699.) Reed offers no persuasive reason to rethink our precedent.

b. Deterrent Value and Monetary Cost of Death Penalty

Reed also argues that the trial court should have instructed the jury that it could not consider the deterrent (or non-deterrent) effect of the death penalty, or the cost of executing a defendant versus imprisoning him or her for life. These instructions are unnecessary, however, when "such considerations are not raised at trial." (*People v. McKinnon* (2011) 52 Cal.4th 610, 696.) Reed does not contend that either party raised arguments related to cost or deterrence, so we reject the claim.

c. CALJIC No. 17.41.1

Reed faults the trial court for instructing the jury using CALJIC No. 17.41.1, which asked jurors to advise the court if "any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on [penalty or punishment, or] any [other] improper basis." We disapproved use of this instruction in 2002 but have since rejected "claims that the instruction violates a defendant's federal constitutional rights." (*People v. Brady* (2010) 50 Cal.4th 547, 587; see also *People v. Wilson* (2008) 44 Cal.4th 758, 805-806.) Reed's trial occurred prior to our 2002 opinion, and he fails to persuade that we should reconsider our precedent.

d. CALJIC No. 8.85

Reed argues that the trial court erred by instructing the jury with a version of CALJIC No. 8.85 that included inapplicable factors and failed to specify whether each factor was aggravating, mitigating, or potentially either. But we have long held that the state and federal constitutions do not require trial courts to provide such a gloss on CALJIC No. 8.85. Reed has not demonstrated why we should overturn settled law on the question. (See, e.g., *People v. Thomas* (2011) 51 Cal.4th 449, 505 [" '[T]he jury is capable of deciding for itself which factors are "applicable" in a particular case.' "], quoting *People v. Ghent* (1987) 43 Cal.3d 739, 777; *People v. Rogers* (2009) 46 Cal.4th 1136, 1178-1179 [rejecting claim that instructions must advise whether CALJIC No. 8.85 factors are aggravating, mitigating, or potentially either].)

e. CALJIC No. 8.88

Reed argues that CALJIC No. 8.88 is unconstitutional in various respects. As he recognizes, we have repeatedly rejected these claims. (See, e.g., *People v. Linton* (2013) 56 Cal.4th 1146, 1211; *People v. Coffman* (2004) 34 Cal.4th 1, 124.) Reed offers no reason to conclude otherwise.

5. *Multiple Murder Special Circumstance*

The only special circumstance alleged and found true in this case was that set forth in section 190.2, subdivision (a)(3) — the so-called "multiple murder" special circumstance. Reed argues that the criterion violates the Eighth Amendment of the federal Constitution by failing to "genuinely narrow" the category of defendants eligible for the death penalty. We have consistently rejected this argument, however, and see no reason to rethink those decisions. (See, e.g., *People v. Covarrubias* (2016) 1 Cal.5th 838, 934 [citing past cases].)

6. *Other Challenges to California's Death Penalty Law*

Reed lodges several other challenges to the constitutionality of California's capital sentencing scheme, all of which he concedes we have previously rejected. We are not persuaded to reconsider our precedent. Specifically, we reaffirm that the state's death penalty scheme does not violate the federal Constitution by failing to sufficiently narrow the class of offenders eligible for the death penalty (*People v. Winbush* (2017) 2 Cal.5th 402, 488); permitting arbitrary and capricious sentencing (*id*. at p. 489); allowing for a death sentence without the jury finding beyond a reasonable doubt the existence of aggravating factors, that aggravating factors outweigh mitigating ones, or that death is the appropriate penalty (*ibid.*); not requiring written jury findings regarding aggravating factors (*id*. at p. 490); forgoing inter-case proportionality review (*ibid.*); allowing prosecutors to use unadjudicated criminal activity as a factor in aggravation (*id*. at p. 489); employing restrictive adjectives such as "extreme" or "substantial" to describe factors in mitigation (*People v. Martinez* (2010) 47 Cal.4th 911, 968); not identifying which factors are aggravating and which are mitigating (*ibid.*); or providing different procedural safeguards to capital and non-capital defendants (*Winbush*, 2 Cal.5th at p. 490). Last, we reaffirm that the state's use of the death penalty does not violate international norms or evolving standards of decency in violation of the Eighth and Fourteenth Amendments. (*Ibid*.)

7. *Reliability of California's Criminal Justice System*

Reed argues that the state's criminal justice system is too unreliable to allow for the imposition of the death penalty. To the extent that Reed challenges the strength of the eyewitness identifications of him, we have already rejected the claim. (See Sections II.B.1-2, *supra*.) To the extent he argues that the state's criminal justice system allows for an unconstitutionally high chance of a wrongful

conviction, we recently discussed that claim at some length and rejected it. (See *People v. Williams* (2013) 58 Cal.4th 197, 296.) We see no reason to reconsider.

8. *Method of Execution*

Reed argues that California's use of lethal injection in the administration of the death penalty violates the Eighth Amendment. But a "challenge to the method of a future execution is not cognizable on appeal, because such a claim does not impugn the validity of the judgment." (*People v. Burney* (2009) 47 Cal.4th 203, 270.)

9. *Cumulative Error*

Reed argues that the cumulative effect of the errors at his trial requires reversal. Because we have found but one error — which was harmless — there is no prejudice to cumulate. (See Section II.B.4, *supra*.) We therefore reject the claim.

### III. CONCLUSION

We affirm the judgment.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**PEÑA, J.**\*

---

\*     Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## DISSENTING OPINION BY LIU, J.

After the prosecutor used five of his first eight peremptory strikes to excuse five of the six black prospective jurors in the jury box, counsel for defendant Ennis Reed raised a challenge under *Batson v. Kentucky* (1986) 476 U.S. 79, 89 and *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277. This pattern of strikes, considered in the totality of circumstances, easily raised an inference of discrimination, and the trial court should have asked the prosecutor to give his reasons for the strikes. I respectfully disagree with the contrary conclusion in today's opinion.

In addition, this case provides another example of the problematic nature of eyewitness identification evidence, particularly where such evidence is the sole or principal evidence against the defendant. (See *People v. Sánchez* (2016) 63 Cal.4th 411, 494–498 (conc. opn. of Liu, J.) (*Sánchez*).) As explained further below, it is time to consider rules that assign the trial court a stronger gatekeeping role in this context.

### I.

As today's opinion notes, the trial court erred in requiring Reed to show a "strong likelihood" that the disputed strikes were racially motivated. (Maj. opn., *ante*, at p. 10.) In *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*), the high court rejected this court's rule that a prima facie case under *Batson* requires a showing that it is " 'more likely than not' " the strikes were based on

impermissible bias.  (*Johnson*, at p. 168.)  The high court explained:  "[W]e assumed in *Batson* that the trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated.  We did not intend the first step to be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.  Instead, a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  (*Id.* at p. 170.)

The showing required to establish an inference of discrimination at *Batson*'s first step is a "low threshold."  (*People v. Scott* (2015) 61 Cal.4th 363, 384 (*Scott*); accord, *Sorto v. Herbert* (2d Cir. 2007) 497 F.3d 163, 170 ["The first step of the *Batson* analysis, requiring the showing of a *prima facie* case, is not meant to be onerous."]; *Paulino v. Castro* (9th Cir. 2004) 371 F.3d 1083, 1092 (*Paulino*) [the showing required at *Batson*'s first stage " ' "is not onerous" ' "]; *Stacey v. State* (Ga. 2013) 741 S.E.2d 881, 841 [same]; *People v. Hecker* (N.Y. 2010) 942 N.E.2d 248, 264 [same]; *Valdez v. People* (Colo. 1998) 966 P.2d 587, 596 [same].)  The threshold is low because "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.  See [*Batson*,] 476 U.S., at 97–98, and n. 20.  The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question."  (*Johnson*, *supra*, 545 U.S. at p. 172.)  The finding of a prima facie case is not tantamount to proof or even a presumption of unlawful discrimination; it simply prompts inquiry into the prosecutor's actual reasons for a peremptory strike.

2

The court observes that the factors "especially relevant" to the first-stage inquiry "include whether a party has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged those prospective jurors in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group to which a majority of remaining jurors belong." (Maj. opn., *ante*, at p. 11.) Almost all of these factors point to the existence of a prima facie case here. At the time of the *Batson* motion, the prosecutor had used five of his first eight peremptory challenges to strike five of the six black prospective jurors in the jury box. The prosecutor engaged in voir dire with only one of the five black jurors whom he struck. And Reed himself is black. It is evident — and the court does not dispute — that these circumstances gave rise to an inference of discrimination. (Cf. *Paulino*, *supra*, 371 F.3d at pp. 1090–1092 [finding prima facie case where the defendant was black and the prosecution had used five out of six peremptory strikes to excuse five out of six black jurors while accepting one black juror].)

Today's opinion nonetheless affirms the trial court's first-stage ruling by resorting to two arguments. First, the court says that the totality of the record, including events after the trial court ruled on the *Batson* motion, dispels "the inference of discrimination that might otherwise be drawn from the prosecutor's initial strikes." (Maj. opn., *ante*, at p. 12.) Second, the court hypothesizes reasons for each of the strikes and concludes that the prosecutor could have had "objectively strong reasons for dismissing the prospective jurors." (*Id.* at p. 16.) Neither argument is persuasive.

**A.**

While acknowledging that "[t]he prosecutor used five of his first eight peremptory strikes (roughly 63 percent) on black jurors, even though such jurors

3

constituted only 34 percent of the venire," the court says we cannot limit our analysis to the circumstances at the time the trial court ruled on the *Batson* motion. (Maj. opn., *ante*, at p. 12.) Instead, we must look to "the entire jury selection process," which reveals that "[s]ix of the prosecutor's thirteen regular juror strikes (46 percent) — and seven of sixteen overall (44 percent) — targeted black jurors." (*Ibid.*) In addition, "the prosecutor first signaled his acceptance of a jury at a time when it contained two black jurors, and three black jurors ultimately sat on the jury." (*Ibid.*)

As an initial matter, I note that this approach — considering events that occurred *after* the trial court ruled on the *Batson* motion — is at odds with our recent statement that "the question at the first stage concerning the existence of a prima facie case depends on consideration of the entire record of voir dire *as of the time the motion was made . . . .*" (*Scott*, *supra*, 61 Cal.4th at p. 384, italics added, citing *People v. Lenix* (2008) 44 Cal.4th 602, 624.) It is also in tension with our holding in *People v. Chism* (2014) 58 Cal.4th 1266 that analysis of postruling developments is "forfeited" on appeal if the defendant did not bring those developments to the trial court's attention by "renew[ing] his *Batson/Wheeler* claim." (*Id.* at p. 1319.) *Chism*, like *Scott*, relied on *Lenix*'s statement that "appellate review is necessarily circumscribed. . . . [T]he trial court's finding is reviewed on the record as it stands at the time the [*Batson/Wheeler*] ruling is made." (*Lenix*, at p. 624, quoted in *Chism*, at p. 1319.) Today's opinion cuts against this statement. Although *Chism* and *Lenix* were addressing third-stage *Batson* analysis, there is no reason to think today's recognition of our obligation to "examine the entire record" (maj. opn., *ante*, at p. 11) should apply only to review of first-stage rulings and not to review of third-stage rulings as well. (See *Chism*, at pp. 1350–1352 (conc. & dis. opn. of Liu, J.) [appellate review of third-stage ruling requires consideration of postruling developments].)

4

In appellate review of a first-stage ruling, postruling developments can be relevant in assessing the significance of a pattern of strikes. "[T]he percentage of potential black jurors struck can change depending on when the defendant objects. If a black juror 'is the first person called, and thus the first person struck, all (or 100%) of the prosecutor's peremptory challenges will have been exercised against African-Americans,' whereas if the same juror is 'called at the end of the *voir dire*, the percentage may be far lower.'" (*Paulino*, *supra*, 371 F.3d at p. 1091.) And "the time at which a statistical pattern is pointed out . . . may be relevant to the weight of the apparent disparity" between the percentage of strikes used against black jurors and the percentage of black jurors in the venire. (*Ibid.*) Today's opinion applies this line of reasoning. (Maj. opn., *ante*, at p. 12.)

But it is perhaps inaccurate to say that such reasoning sheds light on whether the trial court's first-stage ruling was correct. The first step in the *Batson* framework is to decide whether the prosecutor must state reasons for a disputed strike, and the trial court must decide (and can only decide) that question based on the circumstances up to that point. Postruling developments, such as the final percentage of strikes used on black jurors, are better understood as going to the ultimate issue of whether the prosecutor acted with discriminatory intent, not to the preliminary issue of whether the prosecutor should have been required to state reasons for a strike at the time the challenge was made. Postruling developments can provide a basis for denying a *Batson* claim on appeal — whether or not the first-stage ruling was correct when made — if the totality of the record, including such developments, permits no reasonable inference that the prosecutor acted with discriminatory intent.

In support of this approach, the court cites *People v. Garcia* (2011) 52 Cal.4th 706 (*Garcia*). There, the prosecutor used her first three strikes against female jurors, and the defendant filed a *Wheeler* motion. The trial court found no

5

prima facie case of discrimination. On appeal, we said the three strikes comprised too small a sample for us to infer gender discrimination. (*Garcia*, at p. 747.) We observed that women comprised 56 percent (42 out of 75) of the jury pool, 50 percent (7 out of 14) of the jurors ultimately struck by the prosecutor, and — "[m]ost telling" — 83 percent (10 out of 12) of the seated jury. (*Id.* at p. 748.) These circumstances overwhelmingly indicated that the prosecutor did not act with discriminatory intent.

The postruling developments in this case are not nearly so compelling. The fact that three black jurors ultimately sat on the jury is certainly relevant. But I would not say the final percentage of strikes used on black jurors (46 percent in the process of selecting the 12-person jury and 44 percent overall, including selection of alternates) "only barely" exceeds the percentage of black jurors in the venire (34 percent). (Maj. opn., *ante*, at p. 12.) In any event, the more telling comparison is not to the percentage of black jurors in the venire, but to the percentage of blacks among those jurors who reached the jury box and could have been struck. When selection of the 12-person jury had concluded, 38 jurors had been considered; nine of them, or 24 percent, were black. Ten additional jurors, including one black juror, were considered in the selection of alternates. So when the entire jury selection process had concluded, a total of 48 jurors had been considered; 10 of them, or 21 percent, were black. Thus, the final percentage of strikes used on black jurors was substantially greater than the percentage of blacks among the jurors whom the prosecutor could have struck, whether in the selection of the 12-person jury (46 percent versus 24 percent) or in the entire process (44 percent versus 21 percent). In the end, the prosecutor struck seven of the 10 black jurors whom he could have struck. These statistics do not dispel the inference of discrimination arising from the initial pattern of strikes.

6

It is true that the prosecutor, after initially using five out of eight strikes to remove five out of six black jurors, thereafter used only two out of eight further strikes to remove two out of four black jurors. But there is a potential ambiguity in the inference to be drawn from postruling behavior that is apparently nondiscriminatory. Such behavior may indicate that the prosecutor was acting without discriminatory intent all along, or it may indicate that the prosecutor shifted his approach after a *Batson* challenge was made. In some cases, like *Garcia*, the postruling evidence of nondiscrimination is so strong, and the preruling evidence of discrimination is so weak, that there is no ambiguity. But the ambiguity is certainly present here, where the prosecutor's pattern of strikes before the *Batson* challenge differs markedly from his strikes afterward.

In light of this ambiguity and the other considerations above, I do not find the postruling developments in this case to be so probative as to permit no reasonable inference that the prosecutor acted with discriminatory intent. The trial court erred in finding no inference of discrimination from the initial pattern of strikes, and subsequent developments in jury selection do not dispel that inference.

**B.**

The other tack the court takes to find no prima facie case of discrimination is to hypothesize reasons for each of the disputed strikes. We have said that "nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record . . . and that necessarily dispel any inference of bias" are relevant to first-stage analysis. (*Scott*, *supra*, 61 Cal.4th at p. 384, citations omitted.) But the reasons hypothesized by the court fall far short of "necessarily dispel[ling] any inference of bias." (*Ibid.*)

It is worth noting at the outset that although our case law has often hypothesized reasons for a disputed strike as part of first-stage *Batson* analysis, the United States Supreme Court has never approved this practice. (Cf. *Williams v.*

7

*Louisiana* (2016) 579 U.S. __, __ [136 S.Ct. 2156, 2157] (conc. opn. of Ginsburg, J., joined by Breyer, Sotomayor & Kagan, JJ.) [state rule permitting the trial court instead of the prosecutor to supply a race-neutral reason at *Batson*'s second step "does not comply with this Court's *Batson* jurisprudence"].)  In *Johnson*, the high court found an inference of discrimination based on the prosecutor's removal of all three black prospective jurors in a case where a black defendant was charged with killing his white girlfriend's child.  (*Johnson*, *supra*, 545 U.S. at pp. 164–165.)  The trial judge's "own examination of the record had convinced her that the prosecutor's strikes could be justified by race-neutral reasons.  Specifically, the judge opined that the black venire members had offered equivocal or confused answers in their written questionnaires." (*Id.* at p. 165.)  But the high court assigned no weight to the trial court's hypothesized reasons for the strikes.

*Johnson* made clear that "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process.  [Citation.]  The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson*, *supra*, 545 U.S. at p. 172.)  On this point, *Johnson* quoted the Ninth Circuit's statement in *Paulino* that " '[i]t does not matter that the prosecutor might have had good reasons . . . [;] [w]hat matters is the real reason they were stricken.' " (*Johnson*, at p. 172, quoting *Paulino*, *supra*, 371 F.3d at p. 1090, italics omitted by *Johnson*.)  *Paulino* said that "[w]hile we may consider whether 'the record contains entirely plausible reasons, independent of race, why' a prosecutor may have exercised peremptories, [citation], such reasons have usually helped persuade us that defendant made no prima facie showing where defendant challenged the excusal of just one juror." (*Paulino*, at pp. 1091–1092.)  Where there is "a pattern of strikes that raises a plausible inference of

8

discrimination," such reasons have less persuasive value.  (*Id.* at p. 1092.)  In *Paulino*, as in this case, the prosecutor struck five out of six black jurors.  The trial court, at *Batson*'s first step, had engaged in "detailed" evaluation of each strike and had found " 'objective reasons for all of these jurors to be excused.' "  (*Id.* at p. 1089.)  But *Paulino*, like *Johnson*, assigned no weight to such reasons.  (*Id.* at p. 1091.)

"Of course, there may be circumstances where the explanation for a prosecutor's strike of a particular juror is so obvious that there is little or no reason to think anything else could have motivated the strike.  (See, e.g., *People v. Jones* (2013) 57 Cal.4th 899, 982–983 (conc. opn. of Liu, J.) ['[The struck juror] was married to a convicted murderer.  None of the seated or alternate jurors had anything remotely similar in their backgrounds.'].)  In such cases, trial courts need not and should not subject prosecutors to idle inquiry; they may swiftly and justifiably reject 'a spurious claim interposed simply for purposes of harassment or delay.' "  (*People v. Harris* (2013) 57 Cal.4th 804, 872–873 (conc. opn. of Liu, J.) (*Harris*).)  But "[b]ecause it is all too easy to comb the record and find some legitimate reason the prosecution could have had for striking a minority juror, dispelling an inference of discrimination otherwise arising from the totality of circumstances 'requires more than a determination that the record could have supported race-neutral reasons for the prosecutor's use of his peremptory challenges.'  (*Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1110.) . . . . '[I]n light of [*Johnson v. California*], an inquiry into apparent reasons is relevant only insofar as the strikes are so clearly attributable to that apparent, non-discriminatory reason that there is no longer any suspicion, or inference, of discrimination in those strikes.'  (*United States v. Stephens* (7th Cir. 2005) 421 F.3d 503, 516.)"  (*Ibid.*)

Here, the court's hypothesized reasons for the strikes of Janice C. and Mary C. are underwhelming. Janice C., a systems engineer, was married with one child and was "neutral" on the death penalty. Mary C., a retired clerk, was married with two children and believed the death penalty "is OK in some case[s]." The court posits that the prosecutor might have struck them because Janice C.'s spouse had been convicted of a drug offense in 1977 and Mary C.'s husband had been arrested or charged with a crime 10 years before Reed's trial. (Maj. opn., *ante*, at p. 14.) The court also notes that Mary C., on her questionnaire, did not "answer critical questions related to her husband's criminal history." (*Id.* at p. 16.) But the prosecutor did not ask either Mary C. or Janice C. about these matters during voir dire. (Cf. *Miller-El v. Dretke* (2005) 545 U.S. 231, 250, fn. 8 [". . . Warren [a struck juror] had a brother-in-law convicted of a crime having to do with food stamps for which he had to make restitution. [Citation.] [The prosecutor] never questioned Warren about his errant relative at all; . . . the failure to ask undermines the persuasiveness of the claimed concern."].)

Reed observes that if the prosecutor's concern about Janice C. and Mary C. had to do with their family members' arrests or criminal convictions, then the prosecutor should have struck similarly situated non-black jurors. It is notable that the court addresses this contention not by dismissing the appropriateness or relevance of such comparison, but by engaging in comparative juror analysis. (Maj. opn., *ante*, at pp. 15–16.) Today's opinion is the third time in recent years that the court has engaged in such analysis at step one of the *Batson* inquiry. (See *Sánchez*, *supra*, 63 Cal.4th at pp. 439–440; *Harris*, *supra*, 57 Cal.4th at pp. 836–838.) This emerging practice implicitly disavows our prior statements that comparative juror analysis in evaluating hypothesized reasons at stage one "is inappropriate" (*Sánchez*, at p. 439) or "has little or no use" (*People v. Bonilla* (2007) 41 Cal.4th 313, 350). As I have explained elsewhere, such analysis is part

10

of what it means to consider all relevant circumstances at *Batson*'s first stage; no other jurisdiction has rejected the relevance of comparative juror analysis in testing a hypothesized reason for a contested strike; and our case law declining to engage in such analysis defies "a mountain of contrary authority." (*Sánchez*, at p. 492 (conc. opn. of Liu, J.) [collecting cases]; see *Harris*, at pp. 874–876 (conc. opn. of Liu, J.).)

Here, at least three non-black jurors seated on the final jury had relatives who had been arrested: Juror No. 2801's daughter had been arrested for possession of drugs; Juror No. 9716's brother-in-law had been arrested for an unspecified misdemeanor; and Juror No. 1923's brother had been arrested for an "unknown" offense. In addition, two alternate jurors had more direct encounters with law enforcement than either Janice C. or Mary C.: Juror No. 8989 was arrested for disturbing the peace, and Juror No. 0402 was arrested, convicted, and sentenced to a fine and probation for possession of an illegal knife. Whether a prosecutor would regard these jurors' experiences with law enforcement as more or less disqualifying than a spouse's 20-year-old conviction on drug charges (Janice C.) or a spouse's 10-year-old arrest or charge for an unspecified crime (Mary C.) is a matter of speculation — precisely the kind of "needless and imperfect speculation" disapproved by the high court. (*Johnson*, *supra*, 545 U.S. at p. 172.)

*People v. Lancaster* (2007) 41 Cal.4th 50 does not support the court's view. There, the juror in question had a nephew who was convicted of robbery murder and sentenced to life imprisonment without possibility of parole, and another nephew who had been imprisoned for drug offenses. (*Id.* at pp. 77–78.) Further, the defendant's showing of discrimination was "meager," with three black jurors excused but four black jurors remaining impaneled at the time the *Batson* challenge was made. (*Id.* at p. 76.) We said that "*on this record* no inference of

11

group bias appears from the prosecutor's decision to challenge a prospective juror whose family members were serving or had served prison terms." (*Id.* at p. 78, italics added.) The court overreads *Lancaster* by quoting the previous sentence without the italicized words. (Maj. opn., *ante*, at p. 16.)

The reasons posited by the court for the strike of Nickey W. are also questionable. Nickey W. was a 45-year-old black man employed by Burlington Northern Railway; he was married with two children. The court says the prosecutor could have been concerned with Nickey W.'s "conflicting" answers regarding the proper burden of proof. (Maj. opn., *ante*, at p. 15.) But in *Johnson*, the high court assigned no weight to the trial court's finding that "the black venire members had offered equivocal or confused answers in their written questionnaires." (*Johnson*, *supra*, 545 U.S. at p. 165.) Here, moreover, Juror No. 1923 gave an answer to a critical question that was no less confused and contradictory than Nickey W.'s. Asked if he will follow the trial court's instructions on the law that applies to the case even if he disagrees with it, Juror No. 1923 responded "yes" but further explained: "Because I am instructed to follow the court instructins [*sic*] not the law." The prosecutor accepted this juror without seeking clarification in voir dire.

The court cites *People v. Sattiewhite* (2014) 59 Cal.4th 446 (*Sattiewhite*), but the prosecutor in that case "engaged Prospective Juror P.M. in an in-depth voir dire, covering more than five pages of transcript, in which P.M. displayed confused, rambling, and incoherent thinking." (*Id.* at p. 470.) That juror, we said, "exhibit[ed] obvious signs of being unsuitable for the jury." (*Ibid.*) Here, the prosecutor did not engage Nickey W. in voir dire, and the court does not say his questionnaire answers were so confused or incoherent that he was obviously unsuitable for the jury.

12

The court's hypothesized reasons could have given the prosecutor "reasonable concern" (maj. opn., *ante*, at p. 14) or " 'legitimate concern' " (*id.* at p. 15), and "[t]he prosecutor could have readily concluded" that the black jurors should be removed for those reasons (*id.* at p. 16). But in order to dispel an inference of discrimination at *Batson*'s first step, more is required. The posited reasons must be ones "that are apparent from and 'clearly established' in the record and that necessarily dispel any inference of bias." (*Scott*, *supra*, 61 Cal.4th at p. 384, citations omitted.) The court's loose reasoning in support of its hypothesized reasons includes citation to cases decided under the wrong (i.e., pre-*Johnson*) legal standard for first-stage analysis. (Maj. opn., *ante*, at pp. 13–15, citing *People v. Panah* (2005) 35 Cal.4th 395, 440–441, and *People v. Farnam* (2002) 28 Cal.4th 107, 138.) And today's opinion is devoid of the confident language we have used in other cases relying on hypothesized reasons. (See, e.g., *Scott*, at p. 385 ["we doubt that any prosecutor would have kept R.C. on the jury" because the prosecutor "had successfully prosecuted R.C.'s son a year or two earlier and had committed her son to prison — with the assistance of the same lead investigator who would be testifying in the current prosecution"]; *ibid.* ["The record also established compelling reasons to excuse H.R., who in his questionnaire said he was so opposed to the death penalty as to be unwilling to impose it under any circumstances."]; *People v. Taylor* (2010) 48 Cal.4th 574, 644 ["the record . . . shows obvious race-neutral reasons for the excusal of all three of the prospective jurors in question"]; *Sattiewhite*, *supra*, 59 Cal.4th at p. 470 [the juror "exhibit[ed] obvious signs of being unsuitable"].) Today's opinion does exactly what the high court says we should not do: it indulges "the imprecision of relying on judicial speculation to resolve plausible claims of discrimination." (*Johnson*, *supra*, 545 U.S. at p. 173.)

13

In sum, at the time the *Batson* challenge was made, the trial court should have asked the prosecutor to state his reasons for striking five out of six black jurors. In some cases, an available remedy for first-stage *Batson* error is a remand for the trial court to complete the *Batson* analysis. (See, e.g., *Madison v. Commissioner, Ala. Dept. of Corrections* (11th Cir. 2012) 677 F.3d 1333, 1339; *Paulino*, *supra*, 371 F.3d at p. 1092.) But a remand likely is not practical here because the trial occurred almost 20 years ago. (Cf. *Snyder v. Louisiana* (2008) 552 U.S. 472, 486 [no "realistic possibility" that the question of whether discriminatory intent was the determinative cause of the disputed strike "could be profitably explored further on remand at this late date, more than a decade after petitioner's trial"].) I acknowledge that reversal of the judgment is a severe remedy for this kind of error. But there are no other options for giving meaningful effect to *Batson*'s mandate. As a result of the trial court's error, we cannot be confident that Reed was convicted by a jury selected without regard to race.

## II.

In challenging the sufficiency of the evidence as to both murders, Reed contends that the Vasquez murder conviction was wholly based, and the Moreland murder almost wholly based, on unreliable eyewitness testimony. As the court notes, the sufficiency standard is not a high bar; as long as the evidence can reasonably support the verdict, we defer to the jury's credibility determinations and weighing of the evidence. (Maj. opn., *ante*, at pp. 20–22.)

But reliance on uncorroborated eyewitness testimony remains problematic. "[M]istaken eyewitness identifications have played a role in a substantial number of wrongful convictions and unsolved crimes." (*Sánchez*, *supra*, 63 Cal.4th at p. 498 (conc. opn. of Liu, J.), citing Garrett, Convicting the Innocent: Where Criminal Prosecutions Go Wrong (2011) p. 48 [finding that 190 of the first 250 inmates exonerated by DNA testing since 1989 were misidentified by an

14

eyewitness].)  The limited nature of sufficiency-of-the-evidence review is poorly suited to detect or prevent miscarriages of justice that may result from erroneous eyewitness identification.  Such review is premised on our trust in jurors' ability to make sound credibility determinations.  But the jury's ability to perform that function with regard to eyewitness testimony is questionable.  "We presume that jurors are able to detect liars from truth tellers.  But as scholars have cautioned, most eyewitnesses think they are telling the truth even when their testimony is inaccurate, and '[b]ecause the eyewitness is testifying honestly (i.e., sincerely), he or she will not display the demeanor of the dishonest or biased witness.' [Citation.]  Instead, some mistaken eyewitnesses, at least by the time they testify at trial, exude supreme confidence in their identifications."  (*State v. Henderson* (N.J. 2011) 27 A.3d 872, 889 (*Henderson*).)

The limitations of sufficiency-of-the-evidence review suggest that the problem needs to be addressed upstream.  One possible solution is to revise eyewitness jury instructions to more closely align with research into the limitations of eyewitness evidence.  (See, e.g., *Sánchez*, *supra*, 63 Cal.4th at pp. 495–498 (conc. opn. of Liu, J.) [arguing that the part of CALJIC No. 2.92 that links reliability of eyewitness testimony to the witness's degree of certainty should be reexamined in light of research demonstrating a lack of such correlation]; *Henderson*, *supra*, 27 A.3d at pp. 925–926 [urging modification of jury instructions in accordance with generally accepted scientific evidence].)  But given the documented problems with eyewitness testimony and the extent to which jurors rely on it (see *Henderson*, at p. 889 [" 'there is almost *nothing more convincing* [to a jury] than a live human being who takes the stand, points of finger at the defendant and says, "That's the one" ' "], I am not sure we can rely solely on jury instructions to adequately address the issue.

15

The adoption of best, or at least better, practices by law enforcement can help prevent false eyewitness identification.  For example, there is a general consensus that identifications made through photo lineups or live lineups should be videotaped and that the person operating the lineup should not be aware of who the suspect is in order to avoid consciously or unconsciously cuing the witness.  (California Commission on the Fair Administration of Justice, Final Report (2008) p. 27.)  But there is little that courts can do to induce law enforcement to adopt these practices unless courts themselves subject such evidence to greater scrutiny.  Fortunately, there is a substantial body of high-quality research on visual perception and memory to inform such scrutiny by courts, including a 2014 report by the National Academy of Sciences.  (Nat. Research Council, Identifying the Culprit: Assessing Eyewitness Identification (2014).)

The problematic nature of eyewitness evidence has led some state high courts to assign trial courts a stronger gatekeeping role in the admission of such evidence.  Of course, courts have the power to exclude evidence when its probative value is substantially outweighed by its prejudicial effect (Evid. Code, § 352), and courts can exercise the power to exclude eyewitness evidence when, for example, blatantly suggestive lineup procedures make the identification unreliable.  But the New Jersey and Oregon high courts, recognizing the special problems posed by eyewitness evidence, have gone further.

In *Henderson*, the New Jersey Supreme Court held that defendants can obtain a pretrial hearing on the admissibility of eyewitness evidence if they can show some evidence of suggestiveness that could lead to mistaken identification. If the defendant makes that showing, then the state must offer proof on the reliability of the identification, with the defendant carrying the ultimate burden to prove "a very substantial likelihood of irreparable misidentification."  (*Henderson*,

16

*supra*, 27 A.2d at p. 920.)  If the defendant meets the burden, then the evidence should be suppressed.  (*Ibid.*)

The Oregon Supreme Court has taken a somewhat different approach based on Oregon's Evidence Code.  When a defendant has filed a pretrial motion to exclude eyewitness evidence, the trial court must determine by a preponderance of the evidence whether the eyewitness identification was "rationally based" on the witness's perceptions.  (*State v. Lawson* (Or. 2012) 291 P.3d 673, 693 (*Lawson*).)  The court may consider evidence of close observation of the suspect's face supporting such a determination.  (*Ibid.*)  On the other hand, observations of non-facial features like race, height, weight, clothing, or hair color "generally lack the level of distinction necessary to permit the witness to identify a specific person as the person whom the witness saw."  (*Ibid.*)  If the state meets this threshold but the defendant introduces competing evidence to undermine the reliability of the identification, then the state "must establish by a preponderance of the evidence that the identification was based on a permissible basis rather than an impermissible one, such as suggestive police procedures."  (*Ibid.*)

Although I express no definitive view on the merits of these approaches or others, I continue to believe the issue of eyewitness identification "deserves our careful attention."  (*Sánchez*, *supra*, 63 Cal.4th at p. 498 (conc. opn. of Liu, J.).)  This case illustrates some of the problems.  There were several features of the identifications that called their reliability into question:  the witnesses were under a high level of stress; in the case of the Vasquez murder, the witness's attention was likely focused on the gun threatening him; the assailant was viewed under poor lighting conditions and at a considerable distance; there are questions about whether the witnesses viewed Reed's face clearly; cross-racial identification was involved; the time between the occurrence of the crime and the identification of the photo lineup was several months; and the witness in the Moreland murder was

17

intoxicated. (See *Henderson*, *supra*, 27 A.3d at pp. 921–922 [discussing factors affecting reliability of eyewitness identifications]; *Lawson*, *supra*, 291 P.3d at pp. 688–689 [same].)

The eyewitness evidence in this case could have benefited from the kind of screening that New Jersey and Oregon have adopted before it was allowed to go to the jury. The facts of this case illustrate both the stakes involved in eyewitness identification and the challenges such evidence presents. The time has come for the Legislature, the Judicial Council, or this court to develop principles that guide the admissibility of eyewitness identification evidence.

**LIU, J.**

**DISSENTING OPINION BY KRUGER, J.**


I respectfully dissent from the court's judgment for the reasons expressed in Justice Liu's dissenting opinion.  (See dis. opn. of Liu, J., *ante*, pt. I.)


                                                   **KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Reed

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S082776
**Date Filed:** May 7, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** John Joseph Cheroske

_____

**Counsel:**

Gail Harper, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Sharlene A. Honnaka and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gail Harper
P.O. Box 330057
San Francisco, CA  94133
(415) 291-8469

William H. Shin
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 269-6077