Filed 10/31/25; Certified for Publication 12/1/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY SEIGLER,<br><br>        Defendant and Appellant. | A170503<br><br>(Lake County Super. Ct. Nos.<br>CR966388B, CR966389B) |

In March of 2023, defendant Anthony Seigler and his girlfriend and codefendant, Katrina Fowles, called 911 and reported that a group of unknown subjects was banging on their walls, threatening to shoot their son, had fired shots into their residence, and were believed to be inside. Responding officers concluded that both defendants were under the influence of a controlled substance, and that the events as they described them had not occurred. But after officers learned that Seigler had fired two shots through the bathroom wall while his son was in the bathtub, both defendants were arrested for negligent discharge of a firearm. Less than a month later, the couple was again arrested after Fowles's mother reported that they had burglarized her house while she was out of town.

Seigler was charged in two separate cases based on the two incidents, including with negligent discharge of a firearm and burglary. Over the next few months trial in both cases was continued several times, including in

1

August of 2023, after Seigler's counsel filed a written motion seeking a continuance in order to have his client evaluated by a mental health expert, reporting that Seigler was "delusional," unable to "understand the gravity of the potential consequences of his criminal cases," and obviously "in the throes of severe drug addiction, or mental disease, or both." For reasons not revealed by the record, such an evaluation was apparently never performed. But some five months later, on the day of trial, defense counsel again moved for a continuance and filed what purported to be an application for mental health diversion, explaining that he had had difficulty communicating with his client over the life of the case but had applied for and obtained funding for him to be evaluated by a mental health expert. The trial court denied both the motion and the application on the grounds that they were untimely and the prosecution had not been given adequate notice, and despite defense counsel's statement that he was "not prepared to go forward," indicated that it would begin jury selection and proceed to trial in the burglary case. Seigler immediately entered into a plea agreement, entered pleas of no contest to negligent discharge and burglary, and was later placed on two years formal probation. Seigler argues that the trial court abused its discretion in denying his request for a continuance because his application for mental health diversion constituted good cause to do so. We agree, and we reverse.

**BACKGROUND**[1]

**The March 11, 2023 Incident (Case No. CR966388B)**

On March 11, 2023, Lake County Sheriff deputies were dispatched to the residence of Seigler's girlfriend Katrina Fowles, who reported "a group of unknown subjects were outside of her residence banging on the walls and threatening to shoot her son," that "the subjects shot into the residence and

---

[1]    This factual summary is drawn from the probation report.

were believed to be inside," and that her "family was laying down on the bathroom floor."

After conducting a protective sweep and finding no one else inside the residence, the deputies located a firearm and two bullet holes in the bathroom. They questioned Fowles and Seigler, who "reported hearing voices and tapping noises outside," "seeing someone attempting to shoot [their son]," and "hearing two shots." Fowles and Seigler then placed their son in the bathtub and locked the bathroom door. Seigler "was terrified and believed someone was attempting to enter the bathroom, so he fired two shots through the bathroom wall into the bedroom before they all laid [*sic*] down in the bathroom and dialed 911."

The deputies determined that both Fowles and Seigler were "exhibiting signs of being under the influence of a controlled substance,"[2] and that "what [they] claimed did not happen." Both defendants were placed under arrest for discharge of a firearm in a negligent manner (Pen. Code,[3] § 246.3).

**The April 2, 2023 Burglary (Case No. CR966389B)**

On April 2, Lake County Sheriff's deputies were dispatched to the residence of Fowles's mother R.O., who reported that Seigler and her daughter "stole items from her residence while she was out of town." R.O. told deputies that after returning, she "spotted [Seigler] pulling a wagon loaded with her belongings away from her home." After finding her residence

---

[2] According to testimony at the preliminary hearing, these signs included that Seigler's "pupils were dilated" although the incident took place at night, he exhibited "twitching movements," and had "extreme difficulty . . . answering my questions [and] understanding what I was saying." And with respect to Fowles, that she seemed "paranoid" and had an elevated heart rate consistent with being "under the influence of a stimulant."

[3] Further undesignated statutory references are to the Penal Code.

3

"disheveled," with numerous items missing and Seigler's backpack in her living room containing some of her belongings, she called 911.

Responding deputies spoke with Seigler, who "showed [them] the items taken from the victim's home" and alleged that Fowles "informed him he could take" them. After R.O. identified the missing items and confirmed that "no one had permission to take" them, Seigler and Fowles were again placed under arrest.

**The Charges and Pretrial Proceedings**

Two days later, on April 4, the Lake County District Attorney filed a complaint (case No. CR966388B) charging Seigler and Fowles with child endangerment with the possibility of great bodily injury (§ 273a, subd. (a)) (count 1), discharge of a firearm in a negligent manner (§ 246.3) (count 2),[4] and possession of a firearm while under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (e)) (count 3). A separate complaint was filed that same day (case No. CR966389B) charging both defendants with the burglary of R.O.'s home (§ 459).

A hearing was held in both cases on May 9, at which the trial court scheduled a settlement conference for August 4, and a jury trial in both cases for August 23, with a master calendar call on August 18.

On the August 23 trial date, after the settlement conference evidently failed to resolve the cases, Seigler's counsel filed a written motion to continue the trial in the burglary case pursuant to section 1050, subdivision (b), accompanied by a short declaration. The motion indicated that counsel "believe[d his client] to be homeless," that he "typically appears for his court dates, and then he is lost to me" despite counsel's having "reached out to [Seigler's] family to be put in touch with him," and that "[a]s my trial

---

[4] Fowles was not named as a codefendant with respect to count 2.

4

preparation rolled around to his case(s), it was obvious to me that my client is in the throes of severe drug addiction, or mental disease, or both." And the declaration testified that after Seigler arrived 45 minutes late to his August 18 court date, counsel had a conversation with Seigler during which he "was delusional," and which conversation led counsel to conclude that Seigler "does not understand the gravity of the potential consequences of his criminal cases." The declaration opined that Seigler's "mental health has deteriorated to the point where he must now be evaluated by a mental health professional," that it was "incumbent on me to explore certain defenses based on [Seigler's] mental health," and that to do otherwise "would be ineffective assistance of counsel." The motion requested "a continuance during which Mr. Seigler can expeditiously be evaluated" by a mental health professional, which evaluation "would also preserve my ability to file a Petition for Mental Health Diversion, which may become an appropriate option."

The record does not contain a reporter's transcript of the August 23 hearing. But according to the minutes, the motion was unopposed and the trial court granted it, continuing the jury trial in both cases to September 13.

Over the next several weeks, the trial dates in both cases were continued three more times: first, on the prosecutor's motion, due to the unavailability of a material witness; then on defense counsel's motion, due to late discovery provided by the prosecution; and later by agreement of the parties, due to Fowles having obtained new counsel. Ultimately, trial was set for December 6, with a master calendar call on December 1.

On December 1, Seigler and Fowles failed to appear. According to defense counsel, at least in Seigler's case,[5] this was because Seigler

_____

[5]     According to the probation report, Fowles "failed to appear in Court on December 1, 2023, and as of the [February 27, 2024] submission of this

5

"mistakenly thought . . . he could appear on Zoom."  Bench warrants were issued for both defendants, and a further hearing in both cases was set for January 3, 2024.

On December 26, according to the prosecutor, Seigler was arrested.  He was present in custody for the hearing on January 3, at which the trial court set a trial date of February 7 and a master calendar call for February 2.  On January 9, a bail review hearing was held and Seigler was released on his own recognizance.  And on February 2—without Seigler present—the trial court confirmed both cases for jury trial on February 7.

**The Trial**

On February 7, the "trial" began as follows:

"THE COURT:  This matter, CR966388-B, and his other case, CR966389-B, are on for jury trial.  Are they ready to proceed?

"MR. SAVIN [defense counsel]:  They are not.  And I intend to file forthwith an application for mental health pretrial diversion which I have prepared here.  And I also have a 1050(b) motion to comply with—

"MR. GANDY:  The People are ready to proceed.

"THE COURT:  Do the People oppose pretrial—or mental health diversion?

"MR. GANDY:  Yes.  At no point in time that this case has been pending has there been any discussion of mental health diversion until the last week.

"THE COURT:  Okay.  Mr. Savin, did you want to file those?"

---

report, no disposition information is currently available for the co-defendant in this matter."

Defense counsel then a filed a written motion to continue the trial in the burglary case (No. CR966389B),[6] on the grounds that "[s]imultaneous with the filing of this motion, defendant is filing a Petition for Mental Health Diversion," for which "[e]xpert resources have already been requested," and also that "[m]y client has recently provided me with the names of prospective defense witnesses who still need to be vetted." Defense counsel also filed a two-page "Application for Mental Health Pretrial Diversion, Advisement of Rights & Waiver" using local form LK-905, executed that same day by Seigler and counsel, and containing statements that Seigler understood the "Program Rules and Consequences" of the mental health diversion program and waived various rights, including his right to a speedy trial.

After the trial court briefly passed the matter to review the motions, the hearing continued:

"THE COURT: Calling the cases of People v. Anthony Seigler. The defendant and both counsel are present. [¶] I have—we have two issues to deal with. One is the application for mental health pretrial diversion, and the other is the motion to continue. [¶] Regarding the application for mental health pretrial diversion, this was filed today, served on the People today, so I don't think we can proceed to a hearing today unless the People waive notice. Do the People waive notice?

"MR. GANDY: We don't waive notice. This—I wasn't actually served with anything for mental health diversion. I was only served with the motion to continue.

"THE COURT: Do you have a copy that you can—

---

[6]     After the prosecutor observed that the motion to continue was "only for one of the two cases," the trial court clarified with defense counsel that he was also making an oral motion to continue trial in the negligent discharge case (No. CR966388B).

7

"MR. SAVIN: I don't. Typically there's one form, you fill it out in the court. I did it in advance. And then I have never previously served counsel with this new form. I can't—

"THE COURT: This is a new form that I know that Judge Harry has just recently started using. I'm not really sure the process in her court. [¶] But at any rate, you're applying for mental health diversion, your client is. The People are entitled to notice. They haven't been given notice, so we can't do the hearing on this today. [¶] So that leaves us with the motion to continue. Mr. Savin is asking for a continuance so that he can litigate the application for mental health diversion, is that correct?

"MR. SAVIN: Yes. So the Court knows, I already had funds approved for the expert, and so everything's in place to go ahead with that."

The prosecutor then briefly argued against the motion to continue, telling the court that it was only "earlier this week when Mr. Savin approached me and said that this was always a mental health diversion case," and that he had responded, "this is a no time waiver, it's set for trial, and I'm going to be prepared to move forward."

After noting that "this case has a long history" and "[m]y client also at times has been hard for me to communicate with," defense counsel explained that "I have an expert, mental health expert in place," and requested that the trial court set a hearing on the motion for mental health diversion "with enough time that my expert can get involved and so the Court can actually have some salient information to make a ruling."

"And further, I will add that I just got out of a jury trial that ended Friday with the verdict we wanted. I went to another department on a similar case, a 1026 Penal Code case, and on motion the matter was—the person was discharged. So I have trials coming up, the Court may be aware,

8

in a much more important case on the 9th and thereafter. I have a trial the following week in a shooting. So this is appropriate for Mr. Seigler to be evaluated for mental health diversion, and it is appropriate to be continued.

"And as I say, last week I was the only case in trial as far as our case was the only one, so I'm not ducking trials. I'm winning trials. But this case is ready to go to mental health diversion for evaluation, Your Honor."

After giving a brief recitation of the procedural history of the case,[7] the trial court then ruled as follows:

"On February 2nd, both counsel appeared and confirmed the matter for trial. [¶] There's nowhere in the minutes does it indicate that Mr. Seigler was ever requesting mental health diversion or that that was ever an issue. [¶] A motion to continue has been filed today on the day of trial along with an application for mental health pretrial diversion. I don't find good cause to continue the trial in these cases. There's nothing that's been presented that the defendant is eligible for mental health diversion. There's no diligence in filing the motion on the day of trial and filing the application on the day of trial. So for those reasons, I find good cause has not been shown. The motion to continue is denied in each case. [¶] Which case are we going to try first?"

The prosecutor explained that he wanted to try the burglary case first, but "[t]hat officer said he was sick," and "the 388 case could potentially proceed on its own." When asked for his position, defense counsel returned to the motion for mental health diversion, telling the court that under section

---

[7] As part of this recitation, the trial court described the motion to continue the August 23, 2023 trial date as "presumably based on late discovery." In fact, as noted, that motion was based on the need to have Seigler evaluated by a mental health professional. Defense counsel did file a motion to continue trial based on late discovery, but on September 15, 2023, not August 23.

9

1001.36, subdivision (f)(1), "I can file a petition for mental health diversion up until the time there's a disposition. I can even file it in the middle of a trial." He went on that "[m]y client for a very long time was in the wind, frankly, and I haven't had contact with him. . . . He's in better shape than he was, so now I have an opportunity to work with him," "I spared the Court a very lengthy 1050(b) because the statute is pretty clear," and concluded: "We're not prepared to go forward. I'm not going to go forward. So we can deal with the remedy to that."

The trial court then told counsel that it would take a 15-minute morning recess, "[b]ut we need to do a jury trial in one of these cases. I'll meet with counsel in chambers to talk about which case we're going to do a trial on." Defense counsel responded: "Not going to do it. Not going to do it."

After a brief recess, followed by a conference in chambers, defense counsel informed the trial court that "[t]here is a disposition, as was discussed in chambers," and that he was "halfway through" the two required plea forms. The trial court responded, "We're going . . . to get started. If he wants to enter a plea later, I'll accept the disposition. But I have a jury that's been there for an hour and 15 minutes waiting, so we need—we need to get going on that. [¶] . . . [¶] . . . I don't want to come back at noon, be told there's no deal, and we've just wasted two hours. We've already wasted 75 minutes of the jury's time. . . . [¶] . . . I'm going to have a list prepared. When that's prepared, I'm going to meet with counsel regarding hardships. In the meantime, you can continue speaking to your client. And if we have breaks later, you can talk to him. He can read plea forms while you're in chambers, whatever needs to happen. But I can't delay the jury any longer."

After another recess, defense counsel indicated that the parties had reached a disposition. He then made a record of his objection to the trial

court's handling of the application for mental health diversion, explaining that "[p]revious to this past week or so, there was a procedure to follow for mental health diversion, and that was preparing a prima facie document that's a little more fleshed out," which document had been "supplanted by a two-page form that the courts are now requesting us to follow for mental health diversion, and supposedly counsel makes oral representations to the Court about why the mental health diversion should be considered at the prima facie level." Defense counsel argued that despite timely filing Seigler's application using the new two-page form—"timely being that I'm allowed by statute and case law . . . to submit the request for mental health diversion prior to anything dispositive"[8]—he had not been given an opportunity to argue the merits of Seigler's application.

The trial court responded by giving defense counsel such an "opportunity now." Defense counsel briefly argued that "[m]y client for much of this case was really not able to participate in it . . . because he was suffering from a substance abuse disorder which . . . qualifies him for mental health diversion," noted that the negligent discharge case was based on Seigler having acted in response to hallucinations brought on by substance abuse, and requested a prima facie finding that diversion was appropriate. After the prosecutor stated, "I would . . . we were given no notice and just submit," the trial court ruled as follows:

"THE COURT: All right. There's an application for mental health pretrial diversion that's been filed. It's an optional form. Counsel's not

_____

[8] Defense counsel provided the court with citation to *People v. Braden* (2023) 14 Cal.5th 791 (*Braden*), where our Supreme Court held that section 1001.36 requires that a defendant request pretrial mental health diversion before jeopardy attaches at trial or before the entry of a plea of guilty or no contest, whichever occurs first. (*Id*. at pp. 824–825.)

11

required to file this form. I know that Judge Harry uses this form and I've accepted this form. This is an application. Any motions have to be filed ten court days in advance of the hearing. Assuming today was the hearing, this motion or application was filed on the day of the hearing. So pursuant to Rule of Court 4.111 subdivision (b),[9] based on the late filing, I find this application has no merit.

"Even if 4.111 subdivision (b) did not apply, I'm not granting the application because the People weren't given notice.

"In addition, this application simply states that the defendant understands certain aspects of the program, wants to participate in the program, and gives up certain rights. Nothing has been presented to show that any of the elements of—that are required for eligibility for mental health diversion. So for those reasons, the application is denied."

Pursuant to the plea agreements, Seigler then entered a plea of no contest to burglary in case No. CR966389B in exchange for a stipulation to three years probation, and of no contest to the negligent discharge of a firearm count in case No. CR966388B in exchange for a stipulation to two years probation, to be served concurrently. The agreements further provided for dismissal of the balance of the information in the negligent discharge case and up to 180 days in county jail, with day-for-day credit for participation in a residential drug treatment program.

---

9    California Rules of Court, rule 4.111(a) requires that "[u]nless otherwise ordered or specifically provided by law, all pretrial motions, accompanied by a memorandum, must be served and filed at least 10 court days . . . before the time appointed for hearing." And rule 4.111(b) provides: "The court may consider the failure without good cause of the moving party to serve and file a memorandum within the time permitted as an admission that the motion is without merit."

12

At sentencing on March 5, the trial court suspended imposition of sentence and placed Seigler on two years formal probation with various terms and conditions, including that he serve 180 days in county jail with day-for-day credit in a residential drug treatment program.

Seigler filed a notice of appeal.

## DISCUSSION

Motions to continue the trial of a criminal case are "disfavored," and "shall be granted only upon a showing of good cause" under section 1050. (Cal. Rules of Court, rule 4.113; § 1050, subd. (e); see *id*., subd (a).) In general, either party must file a written notice of a request to continue a criminal trial "at least two court days before" the trial date. (§ 1050, subd. (b).) A party may make a motion for a continuance without complying with the two-day notice requirement, in which case the court "shall hold a hearing on whether there is good cause for the failure to comply." (§ 1050, subds. (c), (d).) If the moving party is unable to show such good cause, "the motion for continuance shall not be granted." (§ 1050, subd. (d).) If, however, the court finds good cause for failure to follow the notice requirements, the court must proceed to hear the motion, and may grant the continuance upon a further showing of good cause for the continuance itself. (§ 1050, subds. (e), (f).)

" ' "[T]he decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court." ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 330.) In deciding whether good cause exists, "courts consider whether the moving party has acted diligently, the anticipated benefits of the continuance, the burden that the continuance would impose on witnesses, jurors, and the court" (*People v. Reed* (2018) 4 Cal.5th 989, 1004 (*Reed*)), and " ' " 'above all, whether substantial justice will be accomplished

13

or defeated by a granting of the motion.' " ' " (*People v. Doolin* (2009) 45 Cal.4th 390, 450; see *People v. Gonzalez* (2021) 12 Cal.5th 367, 387.)

We review the trial court's denial of a continuance for abuse of discretion. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.) In particular, we decide whether the " 'denial of a continuance [was] so arbitrary as to violate due process.' " (*Ibid.*, quoting *Ungar v. Sarafite* (1964) 376 U.S. 575, 589.) And " '[t]here are no mechanical tests' " for doing so. (*People v. Mungia, supra,* 44 Cal.4th at p. 1118.) " 'The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " (*Ibid.*) Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 450.)

As to what is required to show an abuse of discretion, it has been described as a decision that "exceeds the bounds of reason" (*People v. Beames* (2007) 40 Cal.4th 907, 920) or one that is "arbitrary, capricious, patently absurd, or even whimsical." (*Artus v. Gramercy Towers Condominium Assn.* (2022) 76 Cal.App.5th 1043, 1051.) But as we explained in *People v. Williams* (2021) 63 Cal.App.5th 990 (*Williams*), "the standard cannot be boiled down to simply calling for reversal *only* if a ruling appears to be arbitrary, capricious or utterly irrational." (*Id.* at p. 1000, italics added, citing *People v. Jacobs* (2007) 156 Cal.App.4th 728, 736–738 (*Jacobs*).)

In *Jacobs*, we discussed the subject at some length, which discussion included the following: " 'Very little of general significance can be said about discretion. " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. [Citation.]' " [Citation.] The

14

scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Id.* at p. 737.) Moreover, "the 'legal principles that govern the subject of discretionary action vary greatly with context. [Citation.] They are derived from the common law or statutes under which discretion is conferred.' " (*Ibid.*; see *Williams, supra*, 63 Cal.App.5th at pp. 1000–1001.)

Our discussion in *Jacobs* also quoted *Concord Communities v. City of Concord* (2001) 91 Cal.App.4th 1407, where our colleagues in Division Four observed that the " 'legal component of discretion was best explained long ago in *Bailey v. Taaffe* (1866) 29 Cal.422, 424: "The discretion intended . . . is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice . . . ." ' " (*Jacobs, supra*, 156 Cal.App.4th at pp. 737–738, quoting *Concord Communities v. City of Concord, supra*, 91 Cal.App.4th at p. 1417; see 9 Witkin, Cal. Procedure (6th ed. 2025) Appeal, § 384.)

Applying these concepts here leads us to the conclusion that the trial court's denial of the motion for a continuance was an abuse of discretion.

The trial court gave three explanations for its decision to deny Seigler's requested continuance: that the "minutes" did not indicate that Seigler "was ever requesting" mental health diversion or that such diversion "was ever an issue," that no showing had been made that Seigler was eligible for such diversion, and that counsel exhibited "no diligence" in filing the motion for a continuance and application for diversion on the day of trial. In short, the

15

trial court appears to have concluded that the motion lacked merit, and was instead a last-minute gambit to delay the trial.

As for the first explanation, the "minutes" may not have indicated that mental health diversion was "ever an issue," but the record as a whole surely did. To begin with, the very facts of the negligent discharge case suggested that Seigler was experiencing mental health issues brought on by substance abuse. As noted, Seigler reported "hearing voices and tapping noises outside," seeing "what he believed to be multiple individuals approaching his residence [and] [feeling] the need to defend himself," and "hear[ing] people in the back bedroom, and so he fired off a round through the wall . . . ." Responding officers concluded that Seigler and Fowles were "under the influence of a controlled substance"—in particular, a "stimulant" causing dilated pupils, "twitching movements," and "paranoi[a]"—and that the events as they described them "did not happen."[10] The record thus at least suggests that Seigler was abusing methamphetamine to the point that it was causing mental health issues—in particular, paranoid delusions or hallucinations— and that those issues led directly to his commission of the charged offenses, which is one of the eligibility criteria for mental health diversion. (See, e.g., *People v. Soto* (2018) 4 Cal.5th 968, 972 [summarizing expert testimony that methamphetamine-induced psychotic disorder can cause "paranoia and delusional thinking, causing [users] to falsely believe that others are threatening them" and "hallucinations, such as hearing voices or seeing

---

[10]    The February 27, 2024 probation report from which we draw the factual summary in this opinion had obviously not been prepared at the time of the trial court's decision. But as of May 3, 2023, the record did contain the transcript of the preliminary hearing in the negligent discharge case where responding Lake County Sheriff's Deputy Kaylene Strugnell testified to essentially the same facts, in some cases in an even more detailed way. (See *ante*, fn. 2.)

16

things that are not there"]; § 1001.36, subd. (b)(2) [eligibility requires that "defendant's mental disorder was a significant factor in the commission of the charged offense"].)[11]

More importantly, and as noted, in August of 2023 defense counsel filed a written motion and declaration seeking a continuance, which together stated that it was "obvious . . . my client is in the throes of severe drug addiction, or mental disease, or both," that in their most recent conversation Seigler was "delusional" and unable to "understand the gravity of the potential consequences of his criminal cases," and concluded by requesting a continuance in order to obtain an evaluation of Seigler by a mental health professional, which evaluation "would . . . preserve my ability to file a Petition for Mental Health Diversion, which may become an appropriate option"—a request the trial court granted. In short—and contrary to the trial court's recollection—the record supports the conclusion that the issue of Seigler's mental health and the possibility of mental health diversion did not appear out of nowhere on the morning of trial, and it likewise provides support for defense counsel's representation that Seigler was "clearly" suffering from mental health issues brought on by substance abuse "over the life of the case."

In any event, as defense counsel repeatedly told the trial court, including by providing citation to *Braden*, *supra*, 14 Cal.5th 791, he was not obligated to seek mental health diversion at any particular point in the pretrial proceedings. Section 1001.36 required only that he do so "before jeopardy attache[d] at trial" (*Braden*, *supra*, 14 Cal.5th at p. 825), i.e., before

---

[11]    Indeed, the probation report would later indicate that Seigler reported consistently using methamphetamine ("1 gram every other day") and that he "stated he has cultivated and borrowed money to support his drug use."

17

a jury was "impaneled and sworn." (*People v. Fields* (1996) 13 Cal.4th 289, 299.)[12]

This brings us to the trial court's finding of a lack of diligence—and in particular, "no diligence"—on defense counsel's part in filing both the motion for a continuance and the application for mental health diversion on the day of trial. The trial court did not ask defense counsel for an explanation of the timing of his motions, or conduct a separate inquiry—as required by section 1050, subdivision (d)—into whether there was "good cause" for his failure to provide proper notice, nor did counsel expressly provide any such explanation. However, defense counsel did repeatedly explain that he was having difficulty communicating with his client, even despite efforts to contact him through him family, and his August 23 motion indicated that Seigler "typically appears for his court dates, and then he is lost to me." And at Seigler's bail review hearing on January 9, defense counsel reiterated that "I've had issues with Mr. Seigler about being a little elusive to talk with me . . . but then he'd appear always in court. It kind of drove me nuts." At that same hearing, the prosecutor acknowledged, "I know that Mr. Savin had indicated he had no contact with the defendant prior to the [December 1] appearance" and that "he's not had much contact" with Seigler even "when he appears in court." The record further indicates that after appearing on September 29, Seigler failed to appear on December 1 and was not again present in court until December 26, when he was present (remotely) from

---

[12]    This answers the trial court's complaint that the record did not indicate that Seigler "was ever requesting" mental health diversion. Defense counsel was not obligated to request mental health diversion at any particular point (or more than once), his motion was timely under *Braden*, *supra*, 14 Cal.5th 791, and the record indicated the possibility that such a motion would be filed as early as August of 2023.

18

custody, a period of some three months. And after being released from custody on January 9, Seigler was not again present in court until a month later on February 7, the day of trial.

Perhaps defense counsel's difficulty communicating with his client unless he was present for a court appearance (and apparently, even when he was), together with the four months between court appearances just described, explains counsel's failure to have had a mental health evaluation of Seigler performed—despite having perceived the need to do so "expeditiously" some five months earlier. As for the lack of notice, as noted, the trial court did not conduct any inquiry into the reasons for counsel's failure to comply with the two-day notice requirement as required by section 1050, subdivision (d), nor does the record reveal any explanation.[13] And the portion of counsel's argument in support of his request for a continuance in which he described other trials that he had recently handled and had upcoming, including at least one that he deemed "much more important," at least suggests some lack of diligence. In short, we cannot exactly say that the trial court's assessment that the timing of defense counsel's motions evinced a lack of diligence "exceed[ed] the bounds of reason" (*People v. Beames*, *supra*, 40 Cal.4th at p. 920), or that it was "arbitrary, capricious, patently absurd, or . . . whimsical." (*Artus v. Gramercy Towers Condominium Assn.*, *supra*, 76 Cal.App.5th at p. 1051.)

But as discussed, our analysis "cannot be boiled down" to the question of whether the aforementioned adjectives apply to the trial court's ruling. (*Williams*, *supra*, 63 Cal.App.5th at p. 1000.) Instead, we eschew

---

[13] Defense counsel's declaration accompanying the motion did state that two days prior to trial, "[o]n Monday, February 5, 2024, I advised the prosecutor of my intentions."

19

" 'mechanical tests,' " and look for the " 'answer . . . in the circumstances present in [the] case.' " (*People v. Mungia, supra*, 44 Cal.4th at p. 1118.) And a finding that defense counsel was less than optimally diligent should not have been the end of the trial court's analysis either. The trial court apparently afforded that finding dispositive weight. But the court was also required to consider "the anticipated benefits of the continuance, the burden that the continuance would impose on witnesses, jurors, and the court" (*Reed, supra*, 4 Cal.5th at p. 1004), and " ' " '*above all*, whether substantial justice will be accomplished or defeated by a granting of the motion.' " ' " (*People v. Doolin, supra*, 45 Cal.4th at p. 450, italics added.) The trial court did not discuss any of these factors, and the Attorney General's brief does not either—indeed, it does not even name them. Nevertheless, we will discuss them briefly here.

We begin by noting that denial of the continuance had two practical effects. The first was that Seigler was never evaluated by the mental health expert for whom his counsel represented he had obtained funds, and his application for mental health diversion was never heard or decided on its merits. A continuance would presumably have enabled Seigler to have such an examination, and—depending on its results—thereafter file a complete application for mental health diversion.[14] And had that application been

---

[14]  As of January 1, 2025, the Lake County Superior Court Local Rules contain a new Rule 5.11, providing that petitions for mental health diversion should, "[t]o the extent such information is available at the time of filing," include "[t]he opinion of a qualified mental health expert indicating that the defendant's symptoms motivating the criminal behavior would respond to mental health treatment," as well as "[a] statement that the defendant consents to diversion and waives the right to a speedy trial," and that as to the latter, Local Form LK-905—the form filed by defense counsel in this case—"may be used for that purpose." (Super. Ct. Lake County, Local Rules,

successful, Seigler would have had the opportunity to obtain mental health treatment under the supervision of the court, instead of facing a criminal trial and its attendant consequences, including the stigma of conviction. (See, e.g., *Braden*, *supra*, 14 Cal.5th at p. 815 ["A main feature of the diversion system is to allow the court to intervene early to support a defendant's rehabilitation and recovery without the stigma of a conviction"].) Furthermore, his successful completion of that treatment program would have resulted in the outright dismissal of the charges against him, all the way down to the record of his arrest. (See *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1078 [upon satisfactory completion of mental health treatment program "defendant's criminal charges are required to be dismissed and the defendant's arrest on the charges 'shall be deemed never to have occurred' "], quoting § 1001.36, subd. (e).) And so the "anticipated benefits of the continuance" (*Reed*, *supra*, 4 Cal.5th at p. 1004), at least for Seigler, were potentially enormous.

Denial of the continuance, and its practical effect of depriving Seigler of a hearing at which he could argue in favor of this outcome on the merits, failed to " ' "subserve . . . the ends of substantial justice." ' " (*Jacobs*, *supra*, 156 Cal.App.4th at p. 738; see 7 Witkin, Cal. Procedure (6th ed. 2025) Trial, § 17 ["A refusal to grant a continuance that has the practical effect of denying the moving party a fair hearing is reversible error"].) And it was contrary to the "abundantly clear" legislative intent behind section 1001.36, namely that "for defendants whose criminal behavior is a function of their diagnosed mental health disorders, treatment is the much preferred option so that diversion should 'apply as broadly as possible.' " (*Sarmiento v. Superior*

rule 5.11, available at <https://lake.courts.ca.gov/system/files/local-rules/local-rules-january-2025_v2.pdf> [as of Oct. 29, 2025].)

21

*Court* (2024) 98 Cal.App.5th 882, 898 (*Sarmiento*); see *People v. Frahs* (2020) 9 Cal.5th 618, 632; *Williams*, *supra*, 63 Cal.App.5th at p. 1004; *Braden*, *supra*, 14 Cal.5th at p. 818 [noting "defense is . . . empowered to delay the entry of plea and to waive time for trial in order to investigate further or consider whether the defendant is 'willing to embrace' mental health treatment"].)

That was bad enough. But to make matters worse, denial of the continuance had a second practical effect. It forced Seigler to choose on the spot between Scylla and Charybdis: proceed at once to trial—a trial his counsel obviously did not expect to actually take place that day, and with which counsel had already announced in open court he was "not prepared to . . . [and] not going to go forward"—or enter into a plea bargain, hastily negotiated and executed while the trial court pressed forward with jury selection.[15] (See *People v. Fontana* (1982) 139 Cal.App.3d 326, 333 (*Fontana*) [finding prejudicial error in denying trial continuance where it was undisputed that defense counsel was unprepared, because "[a] criminal defendant is entitled to a prepared counsel, not merely to a counsel who had time to prepare"]; *Hughes v. Superior Court* (1980) 106 Cal.App.3d 1, 4 ["To force an unprepared counsel to proceed to trial regardless of the reasons for the lack of preparedness would result in a violation of constitutional rights"].)[16] This would have been a tall order for any defendant, never mind

---

[15]   And this quite possibly before Seigler's case had even been fully investigated, as counsel told the court, both at the hearing and in his motion, that "[m]y client has recently provided me with the names of prospective defense witnesses who still need to be vetted."

[16]   Of course, defense counsel *should* have been prepared for trial, and we do not mean to suggest otherwise. But inadequate preparation was not the primary basis for the motion, nor was it among the trial court's reasons for denying it. And as *Fontana* observed, the trial court had other methods to

22

one at one point in the proceedings described by his counsel as "delusional" and lacking "understand[ing of] the gravity of the potential consequences of his criminal cases." This second practical effect of the trial court's decision, like the first, was manifestly unjust. (See *In re Vargas* (2000) 83 Cal.App.4th 1125, 1142 ["Pleas may be set aside if defendants are unduly influenced to accept a plea because their counsel is obviously not prepared to proceed [citation], or the defendants represented by counsel entered into the pleas as a result of fraud or duress"].)

As for the "the burden that the continuance would impose on witnesses, jurors, and the court" (*Reed, supra*, 4 Cal.5th at p. 1004), the trial court did not articulate or rely on any such burden in its ruling, and neither does the Attorney General. Accordingly, we need not discuss it further, but we will make two observations. First, immediately after the trial court denied the motion, the prosecutor told the court that he "want[ed] to do the burglary

---

deal with any lack of preparation on defense counsel's part, namely "the inherent power . . . to impose substantial sanctions on an attorney who without just cause is unprepared to proceed at the time scheduled. Such sanctions can be ordered where justified without jeopardizing the right of the client-defendant to assistance of adequately prepared counsel." (*Fontana, supra*, 139 Cal.App.3d. at p. 335; *Hughes v. Superior Court, supra*, 106 Cal.App.3d at p. 5 [same].)

In any event, for our purposes here, we simply observe that—whether it was true or false—counsel's representation that he was unprepared to go forward with trial, together with the trial court's decision to deny the requested continuance, put Seigler in an untenable position. And the practical effect of putting Seigler there should have weighed into the trial court's consideration of whether denial of the requested continuance would accomplish "substantial justice" (*Reed, supra*, 4 Cal.5th at p. 1004), as it weighs into our similar consideration of whether the trial court exercised its discretion so as to " 'subserve and not . . . impede or defeat the ends of' " the same. (*Jacobs, supra*, 156 Cal.App.4th at p. 738; *Bailey v. Taaffe, supra*, 29 Cal. at p. 424.)

23

case first," but "[t]hat officer said he was sick," and he "want[ed] to confirm what his sickness is before" making the decision to go forward. Second— despite the trial court's repeatedly expressed concern with "wast[ing] . . . the jury's time"—jury selection had not even begun, and thus there was no "jury" whose time was at issue. Any potential jurors had been "waiting" for some 75 minutes, and the burden of *granting* the continuance on these potential jurors was non-existent—presumably a continuance would have resulted in their either being sent home or assigned to serve on a different case. Given the manifest benefits to Seigler of granting a continuance, consideration of this factor cannot tip the scales in favor of the trial court's decision under the circumstances here.

The Attorney General advances two arguments in support of the trial court's decision, but neither is persuasive. First, he argues that the motion to continue was filed in violation of the requirement that all pretrial motions be filed at least 10 court days in advance of the hearing under California Rules of Court, rule 4.111, that the court "may" consider such "failure without good cause . . . as an admission that the motion is without merit" under subdivision (b) of that same rule, and concludes "that is exactly what the trial court did in this case." But to begin with, rule 4.111, subdivision (a) applies only "[u]nless otherwise . . . specifically provided by law," and as already discussed, section 1050 imposes different requirements for a motion to continue trial, including a two-day notice requirement, which requirement may in turn be excused for "good cause." (§ 1050, subds. (c), (d).) More broadly, as our Supreme Court observed in *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, judges are not " ' "automatons," ' " and " ' "routinely reject requests by counsel to function solely in a ministerial capacity. Rigid rule following is not always consistent with a court's function to see that justice is

24

done." (*Id.* at p. 1364.) In any event, suffice to say that the trial court had discretion to excuse noncompliance with the timing and notice requirements of both rule 4.111 and section 1050, and thus the argument again reduces to the question of whether, in denying the motion, the trial court abused that discretion. For all the reasons already discussed, we conclude that it did.

The Attorney General's second argument is that any error in denying Seigler's request for a continuance was harmless because there was no reasonable probability of a different result absent the error under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).[17] But he offers no argument that Seigler failed to satisfy the statutory criteria for eligibility or suitability for mental health diversion.[18] Instead, he asserts that because the trial court

_____

[17] We will assume, without deciding, that *Watson* provides the applicable standard of prejudice.

[18] Briefly, "mental health diversion requires trial court findings that the defendant is both *eligible* for diversion and *suitable* for the program. The criteria for each are specified in the statute. (§ 1001.36, subds. (b) & (c).) Defendants are eligible if they have been diagnosed with a recognized mental disorder that was a significant factor in the commission of the criminal offense with which they are charged. (*Id.*, subd. (b).) They are suitable if: (1) in the opinion of a qualified mental health expert, the defendant's mental disorder would respond to treatment; (2) the defendant agrees to waive their speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an "unreasonable risk of danger to public safety" as defined in sections 1170.18 and 667, subdivision (e)(2)(C)(iv). (§ 1001.36, subd. (c).)" (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 891.)

Of course, we express no opinion on the merits as to whether Seigler should be granted mental health diversion, a question ultimately left to the trial court's discretion. (See *Williams*, *supra*, 63 Cal.App.5th at p. 1000.) But for the purposes of analyzing harmless error, we note that the record contains at least some evidence that a mental health disorder may have been a factor in his commission of the offenses in the negligent discharge case, and Seigler waived his speedy trial rights and agreed to comply with treatment on the local form that counsel submitted at the hearing. Whether Seigler would

had so-called "residual discretion"[19] to deny the motion for diversion even after finding the statutory criteria were met, and because the motion was "argued[] and submitted" and then denied at the hearing, it "would not have been granted, even after a continuance."

We cannot agree. As noted, the trial court denied the motion on the grounds that it was untimely and the prosecution was not given proper notice, as well as that the waiver form submitted by defense counsel failed to show that any of the statutory requirements were met. But the trial court did so without the benefit of any briefing or evidence, including the opinion of a qualified mental health expert as called for under the statute. (See § 1001.36, subds. (b)(1) & (c)(1).) And trial courts are required to exercise the "residual discretion" relied on by the Attorney General "consistent with express statutory requirements and the underlying purposes of mental health diversion, as well as an understanding of the findings that prompted the Legislature to create the diversion program" (*Sarmiento, supra*, 98 Cal.App.5th at pp. 895–896), including the legislative determinations that "for persons with diagnosed disorders, mental health treatment provides the best strategy for breaking the cycle of criminal recidivism," and "in most cases, the community will be safer if defendants . . . receive mental health

---

pose an "unreasonable risk of danger to public safety" permits the trial court to consider Seigler's "criminal conviction history" (§ 1170.18, subd. (b)(1); see § 1001.36, subd. (c)(4)), a history the probation report describes as "insignificant." And the balance of the criteria depend on the opinion of a mental health expert—an opinion that was never prepared as a result of the trial court's decision to deny the requested continuance.

[19] "[E]ven after a defendant makes a prima facie case that she meets all the qualifications to be considered for diversion . . . the court 'may still exercise its discretion to deny mental health diversion.' [Citations.]" (*Sarmiento, supra*, 98 Cal.App.5th at pp. 895–896.)

26

treatment so that they will pose fewer risks to the community both now and in the future." (*Id*. at pp. 897, 898.)  We decline to engage in rank speculation as to the substance of a hypothetical evaluation of Seigler by a mental health expert, or as to how the trial court would have ruled after proceeding all the way through the statutory process.  But the mere possibility that the court could have ultimately denied Seigler's application does not persuade us that there is no "*reasonable chance*, more than an *abstract possibility*" that Seigler's application would have instead been successful.  (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329–330; *Watson, supra*, 46 Cal.2d at p. 836.)

In sum, as the court explained—albeit in the civil context—in *Hamilton v. Orange County Sherrif's Department* (2017) 8 Cal.App.5th 759: "We recognize that [defense] counsel was not optimally diligent," and "he certainly could have better attended to the procedural details of obtaining a continuance.  [¶]  But this relatively minor lack of diligence did not justify the substantial injustice the court's order created. . . . [¶] . . . [¶]  Where denial of a continuance would result in a manifest injustice, as it did here, the policy disfavoring continuances must give way."  (*Id*. at p. 766; see *Denton v. City and County of San Francisco* (2017) 16 Cal.App.5th 779, 793–794 [same].)  So too here.

## DISPOSITION

The judgment is reversed.  The case is remanded with directions that defendant be given a reasonable opportunity to file an application for mental health diversion and, should he choose to file such an application, to have it considered on its merits.  If such diversion is granted and the defendant successfully completes it, the court shall dismiss the charges pursuant to section 1001.36.  If defendant chooses not to seek such diversion, or if the

trial court does not grant his application, the judgment against defendant shall be reinstated.

_____

RICHMAN, J.

We concur.

_____

STEWART, P.J.

_____

MILLER, J.

(A170503)

Filed 12/1/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ANTHONY SEIGLER,<br><br>      Defendant and Appellant. | A170503<br><br>(Lake County Super. Ct. Nos.<br>CR966388B, CR966389B)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter, filed on October 31, 2025, was not certified for publication in the Official Reports.  After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.


Dated: _____

                                    Stewart, P. J.

1

Trial Court:      Superior Court of Lake County

Trial Judge:      J. David Markham, Judge

Counsel:

Sterling E. Tipton under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Catherine A. Rivlin, and Lindsay Thompson, Deputy Attorneys General for Plaintiff and Respondent.

2